**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X    **Docket No.:** 19-CV-08015 (DAB) (HBP)

ROBERT SHERMAN,

                                        Plaintiff,


                -against-


FIVESKY, LLC., FIVESKY TECHNOLOGY
SERVICES, LLC. and REZA POURKHOMAMI,
*In His Individual and Official Capacities*,



                                        Defendants.
-----------------------------------------------------------------X


### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS


**PHILLIPS & ASSOCIATES,**
**Attorneys at Law, PLLC**
Gregory Calliste, Jr.
Yusha D. Hiraman
*Attorneys for Plaintiff*
45 Broadway, Suite 620
New York, New York 10006
T: (212) 248 - 7431
F: (212) 901 - 2107
GCalliste@tpglaws.com
yhiraman@tpglaws.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………..iv

PRELIMINARY STATEMENT…………………………………………………………..1

STATEMENT OF FACTS………………………………………………………..……...2

    A.    Plaintiff Was Constantly Exposed To, And Continually Opposed, Racial Epithets…………………………………...……………………..……..... 2

    B.    Plaintiff Was Exposed to, And Repeated Opposed, Defendants' Conduct……………………………………………………………..……..…4

    C.    Mr. Sherman Faced *Repeated* Discriminatory Insults About His Religion…………. 6

    D.    The Hostile Discriminatory and Abusive Work Environment Continued and Plaintiff's Repeated Complaints Were All Futile…………………………………...……... 6

    E.    As A Result of Plaintiff's Complaint, Defendant Tried and Intended to Annoy Plaintiff, *In Retaliation*, By Escalating His Discriminatory Conduct………...……………….... 7

    F.    Other FiveSky Employees Began to Complain About Pourkhomami's Conduct…..... 9

    G.    Defendant Pourkhomami's Ongoing and Continuous Discriminatory/Retaliatory Conduct Caused Plaintiff to Be Constructively Discharged……………...…………9

ARGUMENT……………………………………………………………………………11

    I.    The Complaint Sufficiently States A Claim for Discrimination Via Hostile Work Environment……………………………………………………...…...……11

        A.    Plaintiff's Gender/Sex-Based Discrimination Claims Are Sufficiently Pled…………………………………………………………….…13

        B.    The Complaint Asserts More Than Just Two Instances of Hostile Sexual Conduct…………………………………………………………..14

        C.    Plaintiff's Religious Based Hostile Work Environment Claims Are Proper……………………………………………………...…..15

        D.    Plaintiff's Complaints Were Met with Further Discriminatory Acts and Insult……………………………………………………………...16

    II.    The Complainant Sufficiently Alleges Discrimination Via Disparate Treatment and Related Adverse Employment Actions…………………………………………17

A.   Constructive Termination, Is an Adverse Employment Action, As A Matter of Law……………………………………………………………..…17

B.   The Complaint Asserts Disparate Treatment Based on Religion…………...…18

C.   Race Claims………………………………………………………………19

D.   Gender Claims……………………………………………………………19

III.   The Complaint Sufficiently Alleges Claims for Retaliation…………………………20

IV.   Plaintiff's Aider and Abettor Claims Are Proper – As A Matter of Law……………23

A.  The Complaint Properly States A Claim for Aiding and Abetting Against Defendant Pourkhomami…………………………………………………...24

CONCLUSION………………………………………………………………………..25

## **TABLE OF AUTHORITIES**

**Cases**

Albunio v. City of New York, 2011 WL 1157706 (2011) ............................................................ 21

Alfano v. Costello, 294 F.3d 365 (2d Cir. 2002) ...................................................................... 14

Argeropoulos v. Exide Tech., 2009 U.S. Dist. LEXIS 59009 (E.D.N.Y. 2009) ......................... 14

Aronson v. Health Care Excel, Inc., 2007 WL 3091579 (S.D. Ind. Oct. 19, 2007) ................... 16

Bader v. Special Metals Corp., 985 F. Supp. 2d 291 (N.D.N.Y. 2013)....................................... 18

Barney v. Consolidated Edison Co. of New York, 2009 WL 6551494 (E.D.N.Y.,2009) ........... 21

Boston v. Taconic Mgmt. Co., 2014 U.S. Dist. LEXIS 117517 (S.D.N.Y. 2014) ...................... 24

Bowles v. N.Y.C. Transit Auth., 2004 WL 548021 (S.D.N.Y. 2004) ......................................... 24

Brown v. Henderson, 257 F.3d 246 (2d Cir. 2001) ..................................................................... 13

Burlington Northern & Santa Fe. Ry v. White, 548 U.S. 53 (2006).............................................. 22

Campbell v. County of Onondaga, 2009 WL 3163498 (N.D.N.Y. 2009) .................................... 12

Carmody v. Vill. of Rockville Ctr., 661 F. Supp. 2d 299, 327 (E.D.N.Y. 2009) ........................ 24

Carrasco v. Lenox Hill Hosp., 2000 U.S. Dist. LEXIS 5637 (S.D.N.Y. 2000)............................ 11

Crawford v. Metropolitan Government of Nashville & Davidson County,

     555 U.S. 271 (2009) ........................................................................................... 21, 22

Cruz v. Coach Stores, Inc., 202 F.3d 560 (2d Cir. 2000) ........................................................... 12

Dall v. St. Catherine of Siena Med. Ctr., 966 F. Supp. 2d 167 (E.D.N.Y. 2013).................. 17, 18

DiFolco v. MSNBC Cable LLC, 622 F.3d 104 (2d Cir. 2010)...................................................... 13

Dingle v. Bimbo Bakeries, 2012 U.S. Dist. LEXIS 97029 (E.D.N.Y. 2012) .............................. 13

Dortz v. City of N.Y., 904 F. Supp. 127 (S.D.N.Y. 1995) ........................................................... 12

Dunson v. Tri-Maintenance & Contractors, Inc., 171 F. Supp. 2d 103 (E.D.N.Y. 2001) ........... 25

Ezuma v. City Univ. of N.Y., 665 F. Supp. 2d 116 (E.D.N.Y. 2009) .................................... 20, 21

Fitzgerald v. Henderson, 251 F.3d 345 (2d Cir. 2001) ..................................................... 17

Fox v. National R.R. Passenger Corp., 2009 WL 425806 (N.D.N.Y. 2009).............................. 12

Francis v. Chemical Bank, 62 F. Supp2d. 948 (E.D.N.Y. 1999)............................................. 16

Gallagher v. Delaney, 139 F.3d 338 (2d Cir. 1998) ............................................................ 11

Gentile v. Town of Huntington, 288 F. Supp. 2d 316 (E.D.N.Y. 2003)..................................... 24

Hall v. N.Y.C. DOT, 701 F. Supp. 2d 318 (E.D.N.Y. 2010)........................................................ 13

Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)........................................................................ 11

Howard v. Sprint/United Mgmt. Co., 299 F. Supp. 2d 180 (S.D.N.Y. 2003) ............................. 21

Humphrey v. County of Nassau, 2009 U.S. Dist. LEXIS 27105 (EDNY 2009)......................... 24

Johnson v. County of Nassau, 82 F. Supp. 3d 533 (E.D.N.Y. 2015)........................................... 24

Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199 (2d Cir. 2006).................... 20

Kirsch v. Fleet St., Ltd., 148 F.3d 149 (2d Cir. 1998) ................................................................ 17

Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59 (2d Cir. 1992)............................ 20

Landau v. New Horizon Partners, Inc., 2003 WL 22097989 (S.D.N.Y. 2003)............................ 24

Leibovitz v. New York City Transit Authority, 252 F.3d 179 (2nd Cir. 2001)............................ 11

Lewis v. Triborough Bridge & Tunnel Auth., 2001 U.S. Dist. LEXIS 361 (S.D.N.Y. 2001)...... 25

Little v. National Broad. Co., 210 F. Supp. 2d 330 (S.D.N.Y. 2002)........................................... 12

Maher v. All. Mortg. Banking Corp., 650 F. Supp. 2d 249 (E.D.N.Y. 2009) .............................. 25

Manswell v. Heavenly Miracle Acad. Servs.,

    2017 U.S. Dist. LEXIS 136366 (E.D.N.Y. 2017) ...................................................... 24

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002) ...................................................... 11

Oncale v. Sundowner Offshore Servs., 523 U.S. 75 (1998) .................................................. 13, 15

Pa. State Police v. Suders, 542 U.S. 129 (2004) ............................................................... 11, 17

Pena v. Brattleboro Retreat, 702 F.2d 322 (2d Cir. 1983) ............................................... 18

Perry v. Ethan Allen, Inc., 115 F.3d 143 (2d. Cir. 1997) ............................................. 11, 12

Pilgrim v. McGraw-Hill Companies, Inc., 599 F.Supp.2d 462 (S.D.N.Y. 2009) ........................ 20

Playboy Enters. Inc. v. Dumas, 960 F.Supp. 710 (S.D.N.Y.1997) ............................................... 24

Punsal v. Mount Sinai Servs. of the Mount Sinai Sch. of Med. of N.Y. Univ., 2004 U.S. Dist.
    LEXIS 5739 (S.D.N.Y. 2004) .................................................................................... 17

Reed v. A.W. Lawrence & Co., 95 F.3d 1170 (2d Cir. 1996) ....................................................... 23

Reid v. Ingerman Smith LLP, 876 F. Supp. 2d 176 (E.D.N.Y. 2012) ............................................. 1

Salvatore v. KLM Royal Dutch Airlines, 1999 U.S. Dist. LEXIS 15551 (S.D.N.Y. 1999) ......... 25

Schwapp v. Town of Avon, 118 F.3d 106 (2d Cir. 1997) ............................................................. 12

SEC v. Smith, 798 F. Supp. 2d 412 (N.D.N.Y. 2011) .................................................................. 24

Stofsky v. Pawling Cent. Sch. Dist., 635 F. Supp. 2d 272 (S.D.N.Y. 2009) ............................... 17

Suarez v. Am. Stevedoring, Inc., 2009 U.S. Dist. LEXIS 105910 (E.D.N.Y. 2009) .................. 12

Summa v. Hofstra Univ., 708 F.3d 115 (2d Cir. 2013) ............................................................... 21

Sumner v. U.S. Postal Serv., 899 F.2d 203 (2d Cir. 1990) .......................................................... 21

Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003) ................................................................... 17, 18

Thompson v. N. Am. Stainless, LP, 562 U.S. 170 (2011) ............................................................ 22

Valleriani v. Route 390 Nissan LLC, 41 F. Supp. 3d 307 (W.D.N.Y. 2014) ............................... 17

Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708 (2d Cir. 1996) .......................................... 11

Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62 (2d Cir.2000) .................................. 12

Wimmer v. Suffolk Cty. Police Dep't, 176 F.3d 125 (2d Cir. 1999) ............................................ 20

Zheng v. GE, 2016 U.S. Dist. LEXIS 4307 (N.D.N.Y. 2016) ...................................................... 24

**Statutes**

42 U.S.C. § 2000e-3(a) ................................................................................ 20

**Other Authorities**

EEOC Compliance Manual §§ 8—II—B(1), (2) .......................................... 22

**Rules**

*FRCP* Rule 8 ................................................................................................ 1

## PRELIMINARY STATEMENT

Plaintiff provides this Memorandum in Opposition to Defendants' Motion to Dismiss, dated December 20, 2019. After a careful review of the argument posited by Defendants in their Motion, the Court should deny Defendants' Motion as the Amended Complaint sufficiently alleges facts to sustain all claims asserted in the Complaint – as a matter of law.

This Case is about Plaintiff, Robert Sherman, a Caucasian, Jewish male, who was employed with Defendant FiveSky between April 2017 and March 2019. After enduring almost two years of continuous and systematic discriminatory verbal and emotional abuse by his manager, FiveSky's owner, Defendant Pourkhomani, Mr. Sherman resigned from his position due to FiveSky's discriminatory, outright disgusting and humiliating work environment (described in detail below).

Defendants now move this Court to dismiss Mr. Sherman's entire Complaint outright. Despite Mr. Sherman's overly-detailed descriptions of the horrendous discriminatory work experiences, which he and others were subjected to at FiveSky, Defendants assert that the Amended Complaint is still insufficient. Defendants' argument in support of dismissal is that, since other employees did not complain about Defendants' conduct (which is untrue), Plaintiff could not have been offended and should not be able to bring these claims. Also, though Plaintiff's Amended Complaint clearly alleges an ongoing and continuous hostile work environment against Plaintiff directly, Defendants invite the Court to filter-out the dozens of incidents alleged in the Complaint, as though none of it is relevant, and reduce same to just two incidents. The arguments posited by Defendants in their memo demonstrates that either Defendants did not read the Complaint, or Defendants chose to blindly ignore all of the facts pled therein and not accept those facts as true for the purposes of their motion to dismiss.

Though the Court's familiarity with *FRCP* Rule 8 is assumed, it appears that Defendants must be reminded that *FRCP* Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief" and does not require Plaintiff to write an overly-detailed narrative about every single event in order to be jurisdictionally sound. Reid v. Ingerman Smith LLP, 876 F. Supp. 2d 176, 180-81 (E.D.N.Y. 2012). Here, Defendants' do not deny the incidents occurred. Instead,

Defendants callously argue that even if the incidents alleged happened, *so what*? Defendants also take the position that they were "*equal opportunity*" harassers and so they are beyond the reach of the law(s). Finally, Defendants argue that despite the overly-robust 43-paged Amended Complaint, Plaintiff has not stated a claim and needs to add even more facts. **Nevertheless, the statutes at issue herein were designed specifically to address work environments like the one at Defendant FiveSky**. In the above regard, the Amended Complaint sufficiently states claims under all statutes alleged and Defendants' motion should be rejected in its entirety.

### STATEMENT OF FACTS

**The below allegations are taken, verbatim, from the Amended Complaint (*see Exhibit A*).**

Mr. Sherman began working at Defendant FiveSky in or around April 2017, as a "Sales Director and/or Account Manager." (***Exhibit A*, Amended Complaint, ¶21**) Defendant Pourkhomami was Mr. Sherman's manager and direct supervisor. Mr. Sherman worked alongside and/or with Defendant Pourkhomami frequently and/or daily (***Id*. ¶23**).

### A.  Plaintiff Was Constantly Exposed To, And Continually Opposed, Racial Epithets:

Not long after Mr. Sherman began his employment at FiveSky, in or around July 2017, Defendant Pourkhomami began to expose Mr. Sherman to an ongoing, continuous, systematic and relentless discriminatory hostile work environment based on race, color, religion, sex, and gender. (***Id*. ¶24**). In or around July 2017, while Mr. Sherman was out at a happy hour event wherein Defendant Pourkhomami was present, Defendant Pourkhomami took Mr. Sherman aside and explained to Mr. Sherman that "***the only way to make real money was by having all the brown people do all the work, and we bill the customer***." This comment immediately made Mr. Sherman uncomfortable. But Mr. Sherman did not react or respond to Defendant Pourkhomami's comment. (***Id*. ¶¶25-26**). As per the Complaint, "**Defendant Pourkhomami made this highly offensive comment to Mr. Sherman because Mr. Sherman is Caucasian**" and "**Defendant Pourkhomami felt emboldened to say offensive comments about 'brown people' to Mr. Sherman because Mr. Sherman was Caucasian and not one of the 'brown people'**." The Complaint makes it clear that Defendant Pourkhomami's

made this particular statement to Mr. Sherman because of Plaintiff's race, Caucasian. (**_Id_**. ¶¶27-29)

The Complaint states that going forward, Mr. Sherman began to hear constant discriminatory and offensive comments from Defendant Pourkhomami - both inside and outside of the workplace. (**_Id_**. ¶30). For example, Defendant Pourkhomami routinely referred to Evan Jackson, an African American employee, as a "***nigger***" on a regular basis. Usually, Defendant Pourkhomami would refer to Mr. Jackson as a "***nigger***" while outside of his presence, but always in front of other employees. But, on occasion, Defendant Pourkhomami would call Mr. Jackson "***nigger***" directly to his face, which Mr. Sherman noticed got Mr. Jackson really emotional/angry. (**_Id_**. ¶¶30-33)

Embarrassed and uncomfortable for himself and for Mr. Jackson, Mr. Sherman complained and stated: **_"you can't do that!"_** Nevertheless, Defendant Pourkhomami continued to use the "n-word" in and around the office and seemed to find the offensive word humorous and entertaining. Indeed, Defendant Pourkhomami continued to refer to African Americans (employees, as well as clients and business affiliates) as "***nigger(s)***" throughout Mr. Sherman's employment. (**_Id_**. ¶¶33-35). Mr. Sherman continued to be made uncomfortable by Defendant Pourkhomami's repeated use of racial epithets and the way it affected his coworkers. Indeed, Mr. Sherman observed that some of his coworkers were uncomfortable with Defendant Pourkhomami's frequent use of racial epithets as well. But, as Pourkhomami was the boss/CEO, no one could stop him. (**_Id_**. ¶¶35-39).

The Complaint states that, on one occasion after hearing Defendant Pourkhomami yell racial epithets in the workplace, Mr. Sherman objected to the unlawful conduct by stating, "***stop doing this. This is not cool***!" On several occasions, Mr. Sherman expressed his uncomfortableness to Defendant Pourkhomami about his use of racially derogatory language in the office. In response, Defendant Pourkhomami stated that he could "***say whatever [he] wants***." (**_Id_**. ¶¶39-41). As per the Complaint, **Mr. Sherman's complaints/concerns were futile**. (**_Id_**. ¶42).

Also, Defendant Pourkhomami would refer to another African American employee named "Levar" as "***my nigger***" (**_Id_**. ¶74). In or around August 2018, while at a work event with Defendant Pourkhomami and Kevin Sharkey, another Caucasian employee, Defendant Pourkhomami began to

refer to Evan Jackson as an African American employee, several times as, "***our Nigger Evan Jackson***." Defendant Pourkhomami also texted and called Mr. Jackson "***Nigger***" on the phone on multiple occasions. (**_Id_. ¶¶68-69**). Defendant Pourkhomami was so amused by his racially discriminatory comments/treatment of Mr. Jackson that Defendant Pourkhomami showed both Mr. Sherman and Mr. Sharkey (both Caucasian) the racially-insulting text messages. Defendant Pourkhomami proudly shared his racist text messages with Plaintiff and Mr. Sharkey with amusement (**_Id_. ¶¶70-73**). As per the Complaint, Defendant Pourkhomami showed Mr. Sherman and Mr. Sharkey the racist text messages **because they were both Caucasian and Pourkhomami felt emboldened to be openly racist towards members of another race with his Caucasian and/or non-African American employees**. (**_Id_.**) Pourkhomami routinely humiliated Mr. Jackson in this manner and caused Mr. Sherman great uncomfortableness each time. (**_Id_.**)

The Complaint states that between on or about November 7, 2018 and on or about November 9, 2018, while at dinner(s) with clients in Canada, Defendant Pourkhomami called one of the clients his "***Nigger***" and/or "***my Niggah***" many times throughout the evening in a crowded restaurant. (**_Id_. ¶¶93-95**). Mr. Sherman pulled Defendant Pourkhomami aside and told him that his behavior "***was out of control***" and that "***he needs to calm down***." In response, Defendant Pourkhomami outright rejected Mr. Sherman's concerns and said that he could, "***do and say whatever [he] wants***." (**_Id_. ¶¶94-98**). Mr. Sherman's complaints were futile and the hostile environment continued (**_Id_.¶¶98-99**).

Defendant Pourkhomami was absolutely comfortable with his behavior in the workplace and his subordinates decided that they would stay quiet and endure the same. For example, on another occasion in the year 2018, Defendant Pourkhomami exclaimed, "***I've got the stupidest chinks working for me***," in the office, while talking about two of his Asian employees. (**_Id_. ¶¶66-67**).

### B.    Plaintiff Was Exposed To, And Repeatedly Opposed, Defendants' Conduct:

On or about January 6, 2018, Mr. Sherman was with Defendant Pourkhomami at a business-related event in Las Vegas, Nevada. (**_Id_. ¶¶44-46**). While at the Cosmopolitan Hotel wherein Mr. Sherman and Defendant Pourkhomami were staying, Defendant Pourkhomami asked Mr. Sherman if

he wanted cocaine and asked Mr. Sherman if he "***need[ed] prostitutes***" to come to his room. (***Id***.) The Complaint states that Defendant Pourkhomami asked Mr. Sherman if he "***needed prostitutes***" **because Mr. Sherman is male**. **Defendant Pourkhomami did not ask similarly situated female employees if they** "***needed prostitutes***." (***Id***. **¶¶47-48**).

At the time, Defendant Pourkhomami directed Mr. Sherman's attention to a table wherein there was cocaine thereon. Mr. Sherman believed that the offer was outrageous, exclaimed "***no!***" and declined the offer(s). Mr. Sherman then went to his room deeply offended at Defendant Pourkhomami's continued outrageous conduct and tried to avoid Defendant Pourkhomami for the remainder of the evening. (***Id***. **¶¶49-51**). The next morning, on or about January 7, 2018, Mr. Sherman brought coffee to Defendant Pourkhomami's room. At that time, Defendant Pourkhomami directed Mr. Sherman's attention to the bed **and showed Mr. Sherman blood stains thereon**. Defendant Pourkhomami then proudly explained that the bloodstains on the bed were a result of Defendant Pourkhomami "***fucking***," one of Defendant FiveSky's vendors' employees named "Vanessa." (***Id***. **¶¶52-54**). The Complaint states that Mr. Sherman was outraged that Defendant Pourkhomami shared the story and gross visual evidence with Mr. Sherman. (***Id***. **¶55**). Especially awkward, was the fact that the story was about one of FiveSky's vendors, with whom Mr. Sherman had an ongoing business relationship. Disgusted and offended, Mr. Sherman left the room immediately and never returned - even when asked by Defendant Pourkhomami to do so. (***Id***. **¶¶56-57**).

As per the complaint, Defendant Pourkhomami showed Mr. Sherman the evidence of his sexual encounter with a vendor **because Mr. Sherman is male. Defendant Pourkhomami did not and would not have shown the display to female employees**. (***Id***. **¶ 58-59**). The Complaint further states that, on one occasion, Defendant Pourkhomami showed nude photos of female employees **only to the male employees** in the office and was careful to **not include female employees** in the show and tell discussion. (***Id***. **¶¶60-61**).

Also, in or around August 2018, while attending the US Open in Queens, Defendant Pourkhomami asked Mr. Sherman to look at some pictures of his new girlfriend, which Defendant

Pourkhomami had on his phone. When Mr. Sherman looked at Defendant Pourkhomami's phone, Pourkhomami pointed-out pictures of his penis and made sure that Mr. Sherman looked. (**_Id_**. ¶¶**74-76**). Some of the photos shown to Mr. Sherman by Defendant Pourkhomami included naked pictures of Defendant Pourkhomami's girlfriend. But, other pictures shown to Mr. Sherman were naked pictures of Andriyana Yakymyshyn, **a female employee in the office**. Once again, Mr. Sherman was made extremely uncomfortable by Defendant Pourkhomami's inappropriate actions. In the workplace, Mr. Sherman remained uncomfortable because he had to work alongside individuals/coworkers (such as Ms. Yakymyshyn), and/or interact with vendors (such as "Vanessa") who Defendant Pourkhomami exposed undressed via sexual photos. (**_Id_**. ¶**84**) Defendant Pourkhomami showed pictures of his naked girlfriend and Ms. Yakymyshyn to Mr. Sherman **because Mr. Sherman is male**. Defendant Pourkhomami did not show pictures of his naked girlfriend and Ms. Yakymyshyn to his similarly situated female employees. Defendant Pourkhomami emphasized and pointed out that his penis was in the picture **because Mr. Sherman is male**. **Defendant Pourkhomami did not and would not brag about and show his penis to his female employees. (_Id_. ¶¶77-86)**. Defendant Pourkhomami had no problem sharing these photos with his male employees and/or discussing his sexual activity **with said women with his male employees** (**_Id_**.).

### C. **Mr. Sherman Faced _Repeated_ Discriminatory Insults About His Religion:**

The Complaint states that, on multiple occasions, including on or about September 6, 2018, Defendant Pourkhomami referred to Mr. Sherman as a "**_cheap Jew_**," for expensing milk for the office. Defendant Pourkhomami's **repeated reference** to Mr. Sherman as a "**_cheap Jew_**" in front of other employees. (**_Id_**. ¶¶**87-88**). Defendant Pourkhomami meant to humiliate Mr. Sherman and subject Mr. Sherman to discriminatory epithets simply because Mr. Sherman expensed milk for the office to use. Mr. Sherman was bewildered by this repeated derogatory reference to his religion ("**_cheap Jew_**"). (**_Id_**. ¶¶**89-92**). Each time he referred to Mr. Sherman as a "**_cheap Jew_**," Defendant Pourkhomami laughed and found it amusing. For obvious reasons, Mr. Sherman was deeply offended (**_Id_**.)

### D. **The Hostile Discriminatory and Abusive Work Environment**

**Continued and Plaintiff's Repeated Complaints Were All Futile:**

The Complaint alleges that "<u>all throughout the year 2018</u>, Mr. Sherman was forced to endure the continuous sexual and racial statements, comments, and situations by Defendant Pourkhomami." (***Id***. ¶¶**62-65**). On a weekly basis between the years 2017 to 2019, Defendant Pourkhomami made many derogatory references to different ethnic groups and religions, including Chinese, African Americans, and Jewish people/coworkers/customers/vendors. (***Id***. ¶**152**)

Mr. Sherman began to complain to Tom Gaughan, a Manager. In response, Mr. Gaughan said things like, "*just do your job and move on.*" As a result, Mr. Sherman came to understand that his complaints were all futile. (***Id***.) The Complaint states that in or around December 2018, **after enduring a constant hostile working environment under Defendant Pourkhomami for over a year**, Mr. Sherman complained to Defendant Pourkhomami about his overall behavior, both in and outside the office, and specifically let Defendant Pourkhomami know that Pourkhomami's actions and the hostile work environment were offensive, discriminatory and made Mr. Sherman feel uncomfortable.

During this meeting, Mr. Sherman specifically suggested Defendant Pourkhomami's behavior could lead to bad press and publicity with new customers and vendors. (***Id***. ¶¶**112-115**). In response, Defendant Pourkhomami **became extremely aggravated and ended the conversation abruptly**. Despite clearly complaining about the above referenced discriminatory conduct, Defendant Pourkhomami continued his offensive and discriminatory behavior.

According to the Complaint, as Defendant Pourkhomami's behavior continued, Pourkhomami became more hostile with regard to verbal abuse against Plaintiff. Defendant Pourkhomami's conduct also continued and became more hostile after Mr. Sherman's numerous complaints. (***Id***. ¶¶**157-158**).

> **E.   As A Result of Plaintiff's Complaint, Defendant Tried and Intended to Annoy Plaintiff, *In Retaliation*, By Escalating His Discriminatory Conduct:**

On or about January 18, 2019, while preparing for a meeting with/at JP Morgan Chase Bank, Mr. Sherman informed Defendant Pourkhomami that they were running late and needed to leave as soon as possible. In response, Defendant Pourkhomami agreed to leave and then yelled, "***let's go***

*Niggers!*." (*Id*. ¶¶**116-118**). Visibly aggravated, Mr. Sherman then said to Defendant Pourkhomami that he, "*need[s] to cut it out already*!" Defendant Pourkhomami found Mr. Sherman's aggravation, annoyance, and complaint amusing and just laughed. (*Id*.) As alleged in the Complaint, due to Mr. Sherman's previous complaints, and Mr. Sherman's clear indications that he found Defendant Pourkhomami's conduct offensive, Defendant Pourkhomami intended to annoy Mr. Sherman because Mr. Sherman made a complaint about Defendant Pourkhomami's conduct. (*Id*. ¶¶**119-121**). Also, Defendant Pourkhomami wanted to prove to Mr. Sherman that he could "*do whatever he wanted*," which seemed to be Defendant Pourkhomami's favorite response to complaints.

Indeed, to further harass and annoy Plaintiff for engaging in protected activity, on or about January 29, 2019, Defendant Pourkhomami assaulted Plaintiff by spiking Mr. Sherman's coffee with hot sauce. This intentional act, that Defendant Pourkhomami found hilarious, burned Mr. Sherman's throat. The Complaint states that Defendant Pourkhomami, intended to humiliate Mr. Sherman in retaliation for Mr. Sherman making too many complaints about Defendant Pourkhomami's discriminatory conduct in the workplace. (*Id*. ¶¶**122-123**).

On or about February 13, 2019, Defendant Pourkhomami continued to attempt to discuss his penis with Mr. Sherman, including bragging about the shape and size of his penis to Mr. Sherman **and other male employees**. In response, Mr. Sherman complained that he found Defendant Pourkhomami's comments about his genitals offensive. However, despite this complaint, Defendant Pourkhomami continued with his offensive conduct. (*Id*. ¶¶**124-126**). According to the Complaint, Defendant Pourkhomami **did not brag about the shape and size of his penis to his similarly situated female employees**. **Defendant Pourkhomami bragged about the shape and size of his penis to Mr. Sherman because Mr. Sherman is male**. (*Id*. ¶¶**127-128**).

On that day, on or about February 13, 2019, while discussing work-related matters in the office, in an effort to further harass Mr. Sherman for complaining about Defendant Pourkhomami's discussions about his penis, Pourkhomami told Plaintiff that Plaintiff "*just gave [Pourkhomami] a boner*." (*Id*. ¶**130**). Mr. Sherman believed that further complaints to Pourkhomami would only add

fuel to the fire and would cause Pourkhomami to further tease and insult Mr. Sherman. When Mr. Sherman complained, Pourkhomami would show Sherman "who was boss" by escalating his offensive activity. (***Id*.**)

Defendant Pourkhomami did not tell his female employees, <u>or the non-complainers</u>, that they gave him a "***boner***" when they performed a work-related duty. Defendant Pourkhomami's sexually offensive remarks, that Mr. Sherman "***just gave me a boner,***" was said to Mr. Sherman because of his gender and in retaliation. Defendant Pourkhomami **did not subject Mr. Sherman's** **similarly situated female coworkers, or the non-complainers, to the same outrageous comments**. (***Id*. ¶¶131-133**).

On or about February 16, 2019, Defendant Pourkhomami had a birthday party for himself at his apartment. During the party, Defendant Pourkhomami was openly and outwardly using the word "***Nigger***," with Plaintiff while referring to the only African American people at the party. (***Id*. ¶¶136-138**). Mr. Sherman continued to be offended by DEFENDANT POURKHOMAMI's racially discriminatory conduct. (***Id*.**)

### F.  <u>Other FiveSky Employees Began to Complain About Pourkhomami's Conduct</u>:

The Complaint asserts that other employees began to raise concerns about Defendant Pourkhomami's racist and discriminatory behavior. (***Id*. ¶¶137-140**). Specifically, on or about February 19, 2019, Mike a Caucasian employee of FiveSky, approached Mr. Sherman and told Mr. Sherman that Defendant Pourkhomami called Delorian, an African American employee, a "***Nigger***." Despite being deeply offended, other employees did not complain about Defendant Pourkhomami's unlawful conduct, as they all knew that complaints were and would have been futile (***Id*. ¶¶137-141**).

### G.  **Defendant Pourkhomami's Ongoing and Continuous Discriminatory/Retaliatory Conduct Caused Plaintiff to Be Constructively Discharged**:

The Complaint continues that on or about February 28, 2019, while working on a proposal for JP Morgan Chase in the conference room with Mike, a Caucasian coworker, Defendant Pourkhomami remarked out of nowhere that he, "***couldn't believe he was working on this proposal with a fuckin***

9

*Jew and a Polack*," referring to Mr. Sherman's and Mike's race/nationalities. (**_Id_. ¶¶142-143**). After enduring months of discriminatory conduct, Mr. Sherman immediately objected to Defendant Pourkhomami's conduct by stating that he "***need[ed] to stop using that reference - fuckin Jew.***" (**_Id_.**) In response, Defendant Pourkhomami stated that he is **"*a Muslim*"** and he **"*[can] say [and] do whatever he wants about Jews*."** Mr. Sherman did not know what Defendant Pourkhomami being "*a Muslim*" had to do with Mr. Sherman's discrimination complaints. But, this comment revealed to Mr. Sherman that Pourkhomami had a discriminatory animus towards individuals that were Jewish because Defendant Pourkhomami is "*a Muslim*."  (**_Id_. ¶¶144-147**). On an almost weekly basis, Defendant Pourkhomami threatened employees' employments -- thus adding to Mr. Sherman's fear that he would be terminated, or threatened therewith, for continuing to complain about DEFENDANT POURKHOMAMI's discriminatory conduct. (**_Id_. ¶159).**

After being told on multiple occasions that Defendant Pourkhomami could do whatever he wanted, Mr. Sherman felt helpless, extremely anxious, and found it difficult to report to the office to work with Defendant Pourkhomami (**_Id_.**). Mr. Sherman began to experience severe anxiety, depression due to Defendant Pourkhomami's continued conduct, Mr. Sherman began to experience daily anxiety and depression with regard to his employment. (**_Id_. ¶111).** Indeed, going into the office daily became a burden as Mr. Sherman did not know what outrageous discriminatory situation he would face on any given day under Defendant Pourkhomami. (**_Id_.**)

Mr. Sherman began seeking medical assistance for his ongoing anxiety issues and his doctor suggested that Mr. Sherman remove himself from the toxic environment to help quell his anxiety and distress. So, in March 2019, Mr. Sherman presented the doctors' note to FiveSky, asked for time off from the hostile environment and **included a written complaint of discrimination**. **This complaint was ignored by Defendants Pourkhomami and/or FiveSky.**

The Complaint concludes that Mr. Sherman was "constructively discharged" as the environment became so intolerable that Mr. Sherman was compelled to leave the environment and/or take medical leave.  (**_Id_. ¶¶165-167**). The environment was permeated with discrimination, ridicule,

insults, retaliation, and humiliation. A return to work at Defendant FiveSky was not possible under the current management and circumstances. (***Id.***).

## ARGUMENT

### POINT I.
### THE COMPLAINT SUFFICIENTLY STATES A CLAIM FOR DISCRIMINATION VIA HOSTILE WORK ENVIRONMENT

**Plaintiff offers this argument in opposition to Points <u>III</u> and <u>VI</u> of Defendants' Motion.**

In order to succeed on a claim for hostile environment, a plaintiff must demonstrate: **(i)** that the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe to alter the conditions of the victim's employment and create an abusive working environment," and **(ii)** "that a specific basis exists for imputing the conduct that created the hostile environment to the employer." <u>Carrasco v. Lenox Hill Hosp</u>., 2000 U.S. Dist. LEXIS 5637, at \*18-19 (S.D.N.Y. 2000), *citing*, <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 715 (2d Cir. 1996). **When the harasser is a supervisor, the employer is presumed to be absolutely liable.** <u>Gallagher v. Delaney</u>, 139 F.3d 338, 347 (2d Cir. 1998). It is important to note that the Supreme Court's standard is "**severe <u>or</u> pervasive (not severe and pervasive)**." <u>Pa. State Police v. Suders</u>, 542 U.S. 129, 133 (2004) (emphases added); <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002). After a plaintiff establishes that the misconduct was "sufficiently severe <u>**or**</u> pervasive to alter the conditions of the victim's employment and create an abusive work environment," <u>Harris v. Forklift Sys., Inc</u>., 510 U.S. 17, 21 (1993), a plaintiff must establish that "a specific basis exists for imputing the conduct that created the hostile work environment to the employer." <u>Perry v. Ethan Allen, Inc</u>., 115 F.3d 143, 149 (2d. Cir. 1997). Here, Plaintiff can establish both elements.

Importantly, the Second Circuit "**recognizes that evidence of harassment directed at other coworkers can be relevant to an employee's own claim of hostile work environment discrimination**." <u>Leibovitz v. New York City Transit Authority</u>, 252 F.3d 179, 190 (2nd Cir. 2001). "Because the crucial inquiry focuses on the **nature of the workplace environment as a whole**, a plaintiff who [himself] experiences discriminatory harassment need not be the target of other instances

of hostility in order for those incidents to support her claim." <u>Cruz v. Coach Stores, Inc</u>., 202 F.3d 560, 570 (2d Cir. 2000); <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 70 (2d Cir.2000) (citing <u>Cruz</u> for proposition that environment as a whole is relevant to individual plaintiff's hostile work environment claim). Further, "**epithets need not be directed at an employee to contribute to a hostile work environment, because 'evidence of harassment of [other members of the protected group], if part of a pervasive or continuing pattern of conduct, [is] surely relevant to show the existence of a hostile work environment**'." <u>Suarez v. Am. Stevedoring, Inc</u>., 2009 U.S. Dist. LEXIS 105910, at 45 (E.D.N.Y. 2009), *citing,* <u>Perry v. Ethan Allen, Inc</u>., at 151 ("error found in the trial court's exclusion of evidence of sexual harassment of other women even though the plaintiff did not witness that harassment because such conduct, 'if part of a pervasive or continuing pattern of conduct, was surely relevant to show the existence of a hostile environment'.").

"When a high-level supervisor, acting within the scope of his actual or apparent authority, furthers the creation of a hostile work environment through sexual harassment, or 'if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship,' liability is automatically imputed to the employer." <u>Dortz v. City of N.Y</u>., 904 F. Supp. 127, 152-53 (S.D.N.Y. 1995). Indeed, the hostile conduct need not be related to Plaintiff's protected class and **can be aimed at other protected classes**, as per the Second Circuit in <u>Cruz v. Coach Stores, Inc</u>., 202 F.3d 560, 570 (2d Cir. 2000)."(remarks **targeting members <u>of other minorities</u>** . . . may contribute to the overall hostility of the working environment for a minority employee."). "A plaintiff can only rely on such evidence to show how the alleged harassment contributed to her own working environment being hostile." <u>Campbell v. County of Onondaga</u>, 2009 WL 3163498 (N.D.N.Y. 2009), *citing,* <u>Fox v. National R.R. Passenger Corp</u>., 2009 WL 425806, at * 6 (N.D.N.Y. 2009).

When evaluating the "quantity, frequency, and severity" of the incidents, the court must look at the incidents "**cumulatively in order to obtain a realistic view of the work environment**." <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 111 (2d Cir. 1997); <u>Little v. National Broad. Co</u>., 210 F. Supp. 2d 330, 389 (S.D.N.Y. 2002). "In particular, the court examines 'the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Hall v. N.Y.C. DOT, 701 F. Supp. 2d 318, 329 (E.D.N.Y. 2010). "In a hostile workplace case, the trier of fact must examine the totality of the circumstances, **including evidence of sexual harassment directed at <u>employees other than the plaintiff</u> . . .**" (*Id.*)

    A.  **<u>Plaintiff's Gender/Sex-Based Discrimination Claims Are Sufficiently Pled</u>:**

    As an initial matter, in Defendants' memorandum at Point III(B), Defendants dedicate pages and pages of wasteful argument attempting to convince the Court that Plaintiff did not assert that any of the sexual conduct taken against him was done "*because he is a male.*" Not only did Defendants blindly ignore the plain text of the Complaint just to make this frivolous argument, but Defendants also invite the Court to do the same. <u>Nevertheless, this is untrue!</u> (*See* Amended Compl. ¶¶47, 48, 58-60, 80-83, 86, 127-128, 133-135, 155-156). **Defendants are obviously not taking the allegations in Plaintiff's Complaint as true, as they must on a motion to dismiss.** ("In assessing the legal sufficiency of plaintiff's claims on a motion to dismiss, the court must accept factual allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party.") <u>DiFolco v. MSNBC Cable LLC</u>, 622 F.3d 104, 111 (2d Cir. 2010). Therefore, Defendants have not even begun to meet their burden in this 12(b) motion. (*Id.*)

    "It is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of [his or] her sex." <u>Dingle v. Bimbo Bakeries,</u> 2012 U.S. Dist. LEXIS 97029, at *9 (E.D.N.Y. 2012), *citing,* <u>Brown v. Henderson</u>, 257 F.3d 246, 252 (2d Cir. 2001). According to the Supreme Court in <u>Oncale v. Sundowner Offshore Servs.</u>, 523 U.S. 75, 80-81 (1998), a case relied upon by Defendants in their memo, "a same-sex harassment plaintiff may offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." (*Id.*) "Plaintiff . . . must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination because of sex." (*Id.*) "A male plaintiff alleging same-sex harassment, like any Title

VII plaintiff, 'must still allege enough facts to plausibly plead his harasser's 'gender-based animus'.'" Argeropoulos v. Exide Tech., 2009 U.S. Dist. LEXIS 59009 at * 3 (E.D.N.Y. 2009). The above allegations demonstrate that Plaintiff met this standard – as a matter of law.

In over a dozen Paragraphs of the Complaint, Plaintiff makes painstaking allegations that he and the other males were subjected to the asserted sexual conduct "***because he is male***" (***See* Amended Compl. ¶¶47, 48, 58-60, 80-83, 86, 127-128, 133-135, 155-156).** Further, the Complaint specifies that Defendant Pourkhomami <u>did not</u> subject Plaintiff's similarly-situated female employees to the same conduct (<u>*Id*</u>.) Further, the Amended Complaint explains precisely how males and females were treated differently by Defendant Pourkhomami with regard to his sexual conduct. (<u>*Id*</u>.)

In any event, as the Complaint is sufficiently pled above and beyond the call of Federal Rule 8(a), "a plaintiff need not satisfy this burden [to prove his entire case] at the motion to dismiss stage." Argeropoulos v. Exide Tech., <u>*Supra*</u>.

### B.    The Complaint Asserts More Than Just Two Instances of Hostile Sexual Conduct:

"A plaintiff alleging a hostile work environment must come forward with sufficient evidence to show 'that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his or] her employment were thereby altered'." Alfano v. Costello, at 373. "This test has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." (<u>*Id*</u>.)

Despite Defendants' short-cited recitation of the facts in the Complaint, Plaintiff did mention many incidents of repeated sexually discriminatory events – not "just two" as asserted by Defendants in their Memo. Defendant Pourkhomami asked Plaintiff if he wanted prostitutes, while offering Plaintiff cocaine (Compl. ¶¶46-48). Pourkhomami showed Plaintiff bloody sheets and bragged about his sexual conquests, which led to same (<u>*Id*</u>. ¶¶53-60). Pourkhomami showed Plaintiff pictures of various naked women (non-employees) in the workplace (<u>*Id.*</u> ¶¶75-76). Pourkhomami showed Plaintiff pictures of naked women (employees) with whom he had private sexual relations (<u>*Id*</u>. ¶¶78-81).

Pourkhomami showed Plaintiff pictures of his own penis and forced Plaintiff to look while discussing his sexual exploits (*Id*. ¶76). Defendant Pourkhomami "had no problem sharing these photos with his male employees and/or discussing his sexual activity with said women with <u>only his male employees</u>." (*Id*. ¶86). Again, Defendant Pourkhomami began bragging about the shape and size of his penis and forced Plaintiff to listen (*Id*. ¶¶124-128). Plaintiff complained and in response, Pourkhomami made sexual comments toward Plaintiff, including that Plaintiff "*gave him a boner*" (*Id*. ¶¶130-135). If the above paragraphs-worth of discriminatory sexual conduct is not enough, Plaintiff further describes that he personally witnessed Pourkhomami engage in some of the same sexual conduct with other **<u>male</u>** employees – **<u>never with female employees</u>** (*See* Amended Compl. ¶¶47, 48, 58-60, 80-83, 86, 127-128, 133-135, 155-156).

Defendants described Defendant Pourkhomami's conduct as "*mild sexual braggadocio*." (Def's Memo., p. 11). We hope that Defendants will make that same argument and admissions to the jury when the time is appropriate. We are certain that a reasonable jury would conclude that Defendant's conduct was well-more than *"ordinary socializing in the workplace -- such as male-on-male horseplay or intersexual flirtation*," which the court in <u>Oncale</u> found not actionable. <u>Oncale</u>, *Supra* at 81. Instead, "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances" a reasonable jury would find Defendant's conduct was more than just mere isolated horseplay.

**C.  <u>Plaintiff's Religious Based Hostile Work Environment Claims Are Proper</u>:**

Defendants argue that Plaintiff's religious-based hostile work environment claims amounted to only "two incidents." Again, Defendants are obviously not taking the allegations in Plaintiff's Complaint as true, as they must in a motion to dismiss. Defendants' outright refusal to address Plaintiff's allegations, while making up their own facts in support of their motion, should be rejected (*infra*).

As per the Complaint, "Defendant Pourkhomami's favorite persons/people to attack were/are persons of the Jewish faith - **<u>often</u>** referring to PLAINTIFF and others as "***Fuckin Jew***" and/or "***Cheap***

*Jew*" (**Amended Compl. ¶ 4**). The Complaint cites numerous incidents wherein Defendant Pourkhomami referred to Plaintiff as a "***Cheap Jew***" in the workplace with the intent to insult Plaintiff based on his religion. (*Id*. ¶¶4, 87-92, 142-146, 152). The Complaint asserts that comments about Jews occurred on a "*weekly basis*" and "*repeatedly over an extended period of time*" (*Id*. ¶¶ 92, 152). Defendants' equating these allegations of "*repeated*" and "*weekly*" comments about Jews to only "two incidents" shows that they are not addressing the Complaint's truth on its face and are instead creating their own self-serving allegations to support frivolous arguments.

Defendants cite to the matter of <u>Francis v. Chemical Bank</u>, 62 F. Supp.2d 948 (E.D.N.Y. 1999) in support of their argument where the Court stated that four isolated incidents (two of which were time-barred), over the course of over three years were not adequate (*See* <u>Francis</u> at 959).  But the facts in <u>Francis</u> are distinguishable here as Mr. Sherman alleges racial/religious epithets against him as a "*cheap jew*" were made "<u>*repeatedly*</u>" and "<u>*weekly*</u>" over the Course of his two-year employment. In the other cases relied upon by Defendants on page 17 of their memo, <u>Ekerman</u> and <u>Aronson</u>, Defendants go far and wide to <u>other federal District Courts in Indiana</u> to find support for their arguments, which they know they cannot find in the local District Courts here in the Second Circuit. However, these cases are distinguishable as well as they both addressed motions for summary judgment and the standards applicable thereto. In <u>Aronson</u>, where the Plaintiff, in that case, testified about two coworkers that made comments about Jews being "cheap" and a supervisor that taped a note to the plaintiff's clothing which read "shop at Walmart like the rest of us," the Court found that a religious hostile work environment was not met. <u>Aronson at</u> 16-17. Here, Mr. Sherman alleges an environment wherein he was referred to as a "*cheap Jew*" on a frequent basis, but his manager and Owner of FiveSky, Defendant Pourkhomami.

### D. <u>Plaintiff's Complaints Were Met with Further Discriminatory Acts and Insult</u>:

For the sake of brevity, Plaintiff will address this fact in detail in <u>Point III</u> below. But, the Complaint makes repeated reference to the fact that Mr. Sherman continued to voice opposition (protected activity) to Defendants' discriminatory hostile work environment - on behalf of himself and

others. As a direct result, Plaintiff would be met with ignorance and amplified abuse meant to antagonize him in retaliation and in furtherance of the hostile environment. (*See* Point III below)

## POINT II.
## THE COMPLAINT SUFFICIENTLY ALLEGES DISCRIMINATION VIA DISPARATE TREATMENT AND RELATED ADVERSE EMPLOYMENT ACTIONS

### A. <u>Constructive Termination, Is an Adverse Employment Action, As A Matter of Law</u>:

In <u>Points IV</u> and <u>VI</u> of their memo, Defendants argue that the Complaint does not allege an adverse employment action and does not properly assert constructive discharge. **This is untrue as well.** Indeed, a surface review of Defendants' memo demonstrates that Defendants may not understand the law(s) under which they move this Court.

The Amended Complaint specifically states that Plaintiff was "**constructively discharged**." **(Amended Compl. ¶¶164-169, 190-192, 211, 224, 241-244, 271, 298-300 and 329).** As the Court is aware, "**<u>constructive discharge</u> is considered an adverse employment action sufficient to support a retaliation claim.**" <u>Valleriani v. Route 390 Nissan LLC</u>, 41 F. Supp. 3d 307, 320-21 (W.D.N.Y. 2014), *citing,* <u>Dall v. St. Catherine of Siena Med. Ctr</u>., 966 F. Supp. 2d 167, 194 (E.D.N.Y. 2013); <u>Punsal v. Mount Sinai Servs. of the Mount Sinai Sch. of Med. of N.Y. Univ</u>., 2004 U.S. Dist. LEXIS 5739, at *22 (S.D.N.Y. 2004). "Adverse employment actions include discharge from employment" and "such a discharge may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge." <u>Stofsky v. Pawling Cent. Sch. Dist</u>., 635 F. Supp. 2d 272, 299 (S.D.N.Y. 2009), *citing,* <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 357 (2d Cir. 2001). "**A constructive discharge is** "**functionally the same as an actual termination**" and therefore is considered an adverse employment action." <u>Dall</u> *supra, at* 177., *citing,* <u>Pa. State Police v. Suders</u>, 542 U.S. 129, 148, (2004); <u>Fitzgerald v. Henderson</u>, 251 F.3d 345, 357 (2d Cir. 2001).

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." <u>Id</u>., *citing,* <u>Terry v. Ashcroft</u>, 336 F.3d 128, 151-52 (2d Cir. 2003), *citing* <u>Kirsch v. Fleet St., Ltd</u>., 148 F.3d 149, 161 (2d Cir. 1998). "Working conditions are intolerable when, viewed as a whole, they are

'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign'." *Id*., *citing*, Terry, 336 F.3d at 152. "**An employee need not show that an employer acted with the specific intent to cause the employee to resign; rather, she need only show that the employer's actions were 'deliberate and not merely negligent or ineffective**.'" Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 310 (N.D.N.Y. 2013). "Plaintiff must allege that "[his] job had become 'intolerable' to the point that [he] was 'forced into an involuntary resignation.'" Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983).

In addition to specifically asserting "constructive discharge," the Complaint further elaborates: [1] that Mr. Sherman was diagnosed with anxiety disorder and was forced to take medical leave from work as a result **(Amend. Comp. ¶¶164-169)** The Complaint further alleges that "the environment became so intolerable that PLAINTIFF was compelled to leave the environment and/or take medical leave." (*__Id.__*) The Complaint states that "the environment was permeated with discrimination, ridicule, insults, retaliation and humiliation" such that "a return to work at [FiveSky] was not possible under the current management and circumstances." (*__Id__*. ¶166). As such, Defendants' argument in Point IV should be rejected because adverse employment actions were properly alleged.

### B. The Complaint Asserts Disparate Treatment Based on Religion:

Also, in Point IV of their memo, Defendants claim that the Complaint does not allege disparate impact and/or that Mr. Sherman failed to assert that he was treated differently than non-Jewish employees. This is also false.

The Complaint repeats that Plaintiff, a Jewish male employee, was repeatedly singled-out and referred to as a "*cheap Jew*." (*infra*). For the sake of brevity, Plaintiff respectfully refers the Court to Point I(c) for the facts related to Plaintiff's religious discrimination claims. **(*See* Point I (c) above)** Further, Defendant Pourkhomami was not an "*equal opportunity harasser*" of all religions as asserted by Defendants. Based on Pourkhomami's own admissions, as alleged in the Complaint, Pourkhomami stated that he "*is Muslim*" and can "*do or say whatever he wanted*" because of that fact.  (*Id*. ¶¶6, 144-146) As such, Muslims were not equally subjected to discriminatory insult in the workplace and were

deemed superior over Jews, by Defendant Pourkhomami. Plaintiff did not allege that Defendant attacked any other religion but Jews (*__Id__*.) For example, though there were Christian/Catholic employees at FiveSky, Plaintiff did not hear Defendant Pourkhomami single out Christians or Muslims for similar ridicule. As such, the Complaint states that Plaintiff was treated differently due to religion.

**C.    <u>Race Claims</u>:**

As for Plaintiff's race claims, the Complaint states that Plaintiff was singled out and subjected to racial epithets against other employees because of his race and that Defendant Pourkhomami specifically targeted Plaintiff to share his racially insensitive attacks and insults against minority and/or darker-skinned employees because of Plaintiff's race (*i.e.* Caucasian). **(Amend Comp. ¶¶27-29, 68, 72, 142).** Despite Plaintiff continuing to complain and tell Defendant Pourkhomami to cease his discriminatory conduct and that same was making him uncomfortable, Defendant Pourkhomami continued and escalated his conduct. (*__Id__*. ¶¶26, 28, 34-40, 72, 94). Among other things, while talking about African American's Defendant Pourkhomami would refer to them as "*brown people*" when talking to Mr. Sherman – because Mr. Sherman was "*Caucasian and not one of the 'brown people'*." (*__Id__*. ¶28). As such, the Complaint specifies that Plaintiff was treated differently due to his race.

**D.    <u>Gender Claims</u>:**

As for Plaintiff's gender-based claims, the Complaint specifically alleges that Plaintiff and other male employees were singled out and subjected to Gender-based discrimination due to their gender (<u>*infra*</u>). The Complaint alleged that Pourkhomami showed Plaintiff and his male coworkers' nude pictures of females that he had sexual relationships with (including employees and vendors) <u>because they were males</u>. The Complaint describes events wherein Plaintiff was offered prostitutes, cocaine and was shown sex/blood-stained sheets, while being forced to listen to Pourkhomam's sexual tales <u>because Plaintiff was male</u>. The Complaint talks about multiple instances wherein Defendant Pourkhomami showed Plaintiff pictures of his genitals, while talking/bragging about the size and shape thereof – <u>because Plaintiff is male.</u> The Complaint confirms that similarly-situated female employees <u>were not</u> subjected to similar conduct and the Defendant Pourkhomami "**did not engage in this type**

of behavior with similarly situated female employees." (*See* **Amended Complaint ¶¶59, 80-85, 125-128, 133-135, 155, 156).**

Interestingly, Defendants blindly cite to every paragraph other than the paragraphs that refute their arguments because Defendants wanted to make more frivolous arguments in their motion. Nevertheless, for the above reasons, Point IV of Defendants' memorandum should be disregarded.

<u>POINT III.</u>
**<u>THE COMPLAINT SUFFICIENTLY ALLEGES CLAIMS FOR RETALIATION</u>**

In <u>Point V</u> of their memo, Defendants argue that Plaintiff's retaliation claims fail because Plaintiff allegedly: **[1]** does not state that he engaged in protected activity; **[2]** that Defendant Pourkhomami's religiously-offensive comments (allegedly) ceased after Plaintiff complained and **[3]** that Plaintiff did not allege any adverse employment action. These arguments are also short-sighted, untrue and further demonstrates that Defendants are adding their own facts while not taking the matters alleged in the Complaint as true for the purposes of their 12(b)[6] motion.

"<u>Title VII</u> prohibits an employer from 'discriminating against any of his employees . . . because [the employee] has opposed any unlawful employment practice." 42 U.S.C. § 2000e-3(a). <u>Wimmer v. Suffolk Cty. Police Dep't</u>, 176 F.3d 125, 134 (2d Cir. 1999). To establish a claim of retaliation under <u>Title VII</u> and the <u>NYSHRL</u>, a plaintiff must show that: **(1)** she was engaged in protected activity; **(2)** defendants knew of this activity; **(3)** defendants took an adverse action against the plaintiff; and **(4)** there is a causal connection between the adverse action and the protected activity, i.e., that the defendants had a retaliatory motive." <u>Kessler v. Westchester County Dep't of Soc. Servs.</u>, 461 F.3d 199, 205-06 (2d Cir. 2006); *see also* <u>Pilgrim v. McGraw-Hill Companies, Inc.</u>, 599 F.Supp.2d 462, 469 (S.D.N.Y. 2009).

"The phrase '*opposed any practice*' encompasses an individual's complaints to supervisors regardless of whether she also files an EEOC charge." <u>Ezuma v. City Univ. of N.Y.</u>, 665 F. Supp. 2d 116, 122 (E.D.N.Y. 2009), *citing*, <u>Kotcher v. Rosa & Sullivan Appliance Ctr., Inc</u>., 957 F.2d 59, 65 (2d Cir. 1992). "**For purposes of a retaliation claim, 'opposition' to discrimination need not rise**

to the level of a formal complaint in order to receive statutory protection and includes activities such as making complaints to management, <u>protesting discrimination</u> and expressing support of co-workers who have filed formal charges." <u>Ezuma</u>, *supra, citing,* <u>Barney v. Consolidated Edison Co. of New York,</u> 2009 WL 6551494 (E.D.N.Y.,2009); <u>Albunio v. City of New York</u>, 2011 WL 1157706 (2011) (*NY Court of Appeals upheld a jury's verdict in favor of two employees that claimed they were subjected to retaliation for opposing discrimination against a third employee*), *see also,* <u>Howard v. Sprint/United Mgmt. Co</u>., 299 F. Supp. 2d 180 (S.D.N.Y. 2003) (*male employee claimed retaliation by his supervisors after reporting incidents of sexual harassment of female co-workers*).

"The Supreme Court, recently clarified in <u>Crawford v. Metropolitan Government of Nashville & Davidson County</u> that, "**[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity."** <u>Crawford,</u> 555 U.S. 271, 276 (2009). Section "704(a)'s opposition clause protects [formal] as well [as] informal protests of discriminatory employment practices, including making complaints to management, writing critical letters, protesting against discrimination by industry or by society in general and expressing support of co-workers who have filed formal charges." <u>Sumner v. U.S. Postal Serv</u>., 899 F.2d 203, 209 (2d Cir. 1990). "For purposes of the opposition clause, a plaintiff must have a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." <u>Summa v. Hofstra Univ</u>., 708 F.3d 115, 126 (2d Cir. 2013). The question is whether the plaintiff's course of conduct as a whole (1) "communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination," and (2) concerns subject matter that is "actually or reasonably believed to be unlawful under <u>Title VII</u>." <u>Crawford</u>, *supra.*

"The first element of the prima facie standard requires that Plaintiff have taken 'action . . . to protest or oppose statutorily prohibited discrimination'." <u>Id</u>. In the Case at bar, the Complaint states that Plaintiff continued to complain against/protest Defendants' discriminatory actions against Jews, women and African Americans. **(Amend Compl. ¶¶6, 34, 37-40, 94-97, 112-115, 118-120, 143).**

Plaintiff complained to other managers in the office, who would tell Plaintiff to "*just do your job and move on.*" (**Id.** **¶61-63**). The Complaint further alleged that Defendant Pourkhomami responded to Plaintiff's complaints by ignoring same, abruptly ending meetings and then – to show Plaintiff who was the boss - escalated his discriminatory behavior <u>specifically to torment Plaintiff for complaining</u> (**Id.** **¶¶114, 115, 120, 157-158**) and/or Defendant Pourkhomami would rebel against Plaintiff stating that he "***can do whatever he wanted.***" (**Id.** **¶¶ 41, 97, 121, 144, 147**). Indeed, on one occasion, Plaintiff states that Defendant retaliated against him by spiking his coffee with hot sauce, causing Plaintiff's throat to be burned (**Id.** **¶122-123**) Plaintiff asserts that his complaints were all futile and that Defendants did not have an anti-discrimination policy in place or a way to make discrimination complaints (**Id.** **¶¶ 65, 98, 102-109**). Accordingly, the Complaint properly alleged that Plaintiff engaged in protected activity, that Defendants were aware of same and that said complaints were futile and ignored.

The Supreme Court defined "*oppose*" in this context by looking to its ordinary meaning: "**to resist or antagonize . . . ; to contend against; to confront; resist; withstand, . . . to be hostile or adverse to, as in opinion.**" <u>Crawford</u> at 276. This broad definition led the Court to conclude that the threshold for oppositional conduct is not onerous. Instead, "[w]hen an employee communicates to his employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Id*. at 276, *citing,* 2 <u>EEOC Compliance Manual</u> §§ 8—II—B(1), (2). This is particularly so in the retaliation context, where <u>Title VII</u> "**must be read 'to provide <u>broader protection for victims of retaliation</u> than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination,' because 'effective enforcement could only be expected if employees felt free to approach officials with their grievances'**." <u>Burlington N</u>., 548 U.S. at 66-67; *see also* <u>Thompson</u>, 562 U.S. at 174. Here, most certainly, the Complaint alleges several complaints made to Defendants that were ignored and/or met with further discriminatory acts by Defendant Pourkhomami to communicate to Plaintiff to shut up because Pourkhomami could "*do whatever [he] wanted.*"

Accordingly, "in order to impute to an employer liability for the actions of an employee 'a plaintiff must . . . prove that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1180 (2d Cir. 1996). In this regard, the Complaint states that Defendants had no anti-discrimination policy or reasonable avenue to address complaints of discrimination (*Id*. ¶¶ **100-109).**

Finally, Plaintiff incorporates the arguments in Point II(A) above in support of the fact that Plaintiff did allege constructive discharge, which is an adverse employment action.  Causal connection is alleged in **paragraphs 111, 147-150, 164-166**. Here, the Compliant states*, inter alia,* that Plaintiff could not endure the hostile work environment and that Plaintiff went to work every day fearing what outrageous conduct he would be exposed to next. As a direct result, Plaintiff began to suffer from anxiety and could not report to work. (*Id*.) As such, Plaintiff does not understand where Defendants got the allegation that Defendant Pourkhomami's conduct ceased after Plaintiff complained as they argue in their brief (*See* Def's Brief at p. 23). That allegation *did not* come from Plaintiff's complaint and so, once again, Defendants are making up their own facts while not taking the allegations in the Complaint as true for the purposes of this 12(b) motion.

**POINT IV.**
**PLAINTIFF'S AIDER AND ABETTOR CLAIMS ARE PROPER – AS A MATTER OF LAW**

In Point VII of Defendants' memorandum, Defendants argue that Plaintiff's aider and abettor claims must be dismissed because Plaintiff allegedly did not plausibly allege discrimination, harassment or retaliation. (*See,* Def's Memo. Point VII, p. 25). However, Defendants' Point VII is two lines long and is devoid of any support or substantive arguments. (*See Id*.) Accordingly, the Court should ignore this Point from the outset. Insofar as Defendants are relying on arguments asserted in other points to support this argument, Plaintiff relies on the above arguments in this brief herein. Insofar as Defendants intend to offer a more robust argument toward this Point in their reply papers, same must be rejected by the Court outright. *See* Bowles v. N.Y.C. Transit Auth., 2004 WL 548021, at *3 (S.D.N.Y. 2004) ("The Court need not consider arguments raised for the first time in reply

23

memoranda."); Landau v. New Horizon Partners, Inc., 2003 WL 22097989, at *10 (S.D.N.Y. 2003) (rejecting argument "raised for the first time in ... reply papers ... because the plaintiff had no opportunity to respond to such arguments, and in any event, full consideration and development of this issue requires that the argument be raised in the original moving papers."); Playboy Enters. Inc. v. Dumas, 960 F.Supp. 710, 720 n. 7 (S.D.N.Y.1997) ("Arguments made for the first time in a reply brief need not be considered by a court."). Nevertheless, we make the below argument based on what we anticipate Defendants will argue in their reply.

### A. The Complaint Properly States A Claim for Aiding and Abetting Against Defendant Pourkhomami:

Unlike Title VII, NYSHRL and NYCHRL both provide for individual liability. "Under Section 296(1), a supervisor may be held liable as an 'employer' if he or she has 'the authority to 'hire and fire' employees'." Carmody v. Vill. of Rockville Ctr., 661 F. Supp. 2d 299, 327 (E.D.N.Y. 2009), Gentile v. Town of Huntington, 288 F. Supp. 2d 316, 321 (E.D.N.Y. 2003). In addition, both supervisors and co-workers may be held individually liable under an aiding and abetting theory where he or she "**actually participates in the conduct giving rise to a discrimination claim**." _Id_., _citing,_ Humphrey v. County of Nassau, 2009 U.S. Dist. LEXIS 27105, at *72-73 (EDNY 2009); Johnson v. County of Nassau, 82 F. Supp. 3d 533, 536 (E.D.N.Y. 2015). "Personal involvement for managers in this context can include **failure to take action** upon receiving information that constitutional violations are occurring." SEC v. Smith, 798 F. Supp. 2d 412, 455; Manswell v. Heavenly Miracle Acad. Servs., 2017 U.S. Dist. LEXIS 136366, (E.D.N.Y. 2017).  Further, "an employee can be liable even where the NYSHRL discrimination claim against the employer has been dismissed. Zheng v. GE, 2016 U.S. Dist. LEXIS 4307, at *13-15 (N.D.N.Y. 2016); Boston v. Taconic Mgmt. Co., 2014 U.S. Dist. LEXIS 117517, at *2 (S.D.N.Y. 2014) ("the individual defendant can be held liable for aiding and abetting regardless of whether his actions form the basis for the defendant employer's liability in the first instance.").

"The same standards of analysis used to evaluate aiding and abetting claims under the <u>NYSHRL</u> apply to such claims under the <u>NYCHRL</u> because the language of the two laws are "virtually identical." <u>Dunson v. Tri-Maintenance & Contractors, Inc</u>., 171 F. Supp. 2d 103, 113-114 (E.D.N.Y. 2001).

"An individual may be liable under § 296(6) for aiding and abetting an unlawful discriminatory practice of his employer **even where his conduct serves as the sole predicate for the employer's liability**." <u>Maher v. All. Mortg. Banking Corp</u>., 650 F. Supp. 2d 249, 262-63 (E.D.N.Y. 2009), *citing,* <u>Lewis v. Triborough Bridge & Tunnel Auth</u>., 2001 U.S. Dist. LEXIS 361, at *2 (S.D.N.Y. 2001) (stating that "this Court follows the majority of decisions in this district in recognizing that an individual can be liable for aiding and abetting his own discriminatory conduct"); *see also,* <u>Salvatore v. KLM Royal Dutch Airlines</u>, 1999 U.S. Dist. LEXIS 15551, at *8 (S.D.N.Y. 1999) (finding aider and abettor liability where the defendant was "the sole employee engaged in the unlawful conduct").

Here, the Complaint sufficiently alleges all throughout that Defendant Pourkhomami was the main and sole harasser, who was personally involved in the discriminatory actions against Plaintiff. The Complaint states that Defendant Pourkhomami utilized his position of authority over Plaintiff to subject Plaintiff to the discriminatory acts alleged (**Compl. ¶¶239, 264-283 and 322-341).** The Complaint painstakingly describes Defendant Pourkhomami's <u>personal involvement</u> in the actions giving rise to the Complaint. (*Id*.). The Complaint states that Defendant Pourkhomami had notice of Plaintiff's complaints and failed/refused to act to correct the hostile work environment and that Plaintiff's complaints were nullified and treated as futile. (*Id*.)   The Complaints states how Defendant Pourkhomami ignored any anti-discrimination policies that existed, to the detriment of Plaintiff. (*Id*. at 187, 238, 265, 276). As Plaintiff's complaint plausibly alleges discrimination, retaliation and hostile work environment, all of the above allegations contained in the Complaint are sufficient to sustain an aiding and abetting claim against Defendant Pourkhomami individually.

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' motion in its entirety.

Dated:  New York, New York
       January 24, 2020

                                **PHILLIPS & ASSOCIATES,**
                                **ATTORNEYS AT LAW, PLLC**

By:                 /**S**/
                                Gregory Calliste, Jr. *
                                Yusha Hiraman
                                *Attorneys for Plaintiff Robert Sherman*
                                gcalliste@tpglaws.com
                                yhiraman@tpglaws.com