UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                        :

ROBERT SHERMAN,                     :

                       :

               Plaintiff,      :         19-cv-8015 (LJL)

      -v-                   :

                       :       OPINION & ORDER

FIVESKY, LLC, FIVESKY TECHNOLOGY    :
SERVICES, LLC, and REZA POURKHOMAMI,  :

                       :

             Defendants.     :

                       :

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/5/2020__

LEWIS J. LIMAN, United States District Judge:

On August 27, 2019, Robert Sherman ("Plaintiff") brought this employment

discrimination action against his former employer, Fivesky, LLC and Fivesky Technology

Services, LLC (together, "Fivesky") and its Chief Executive Officer Reza Pourkhomami

("Pourkhomami" and together with Fivesky, "Defendants").  Dkt. No. 11.  On November 12,

2019, Plaintiff filed an Amended Complaint ("Amended Complaint" or "AC").  Defendants filed

the operative motion to dismiss on December 20, 2019 ("MTD"), Dkt. No. 14, Plaintiff

submitted his opposition on January 24, 2020 ("Opp."), Dkt. No. 17, and Defendants submitted

their reply on February 7, 2020 ("Reply"), Dkt. No. 19.  Oral argument was held on April 30,

2020.

Plaintiff brings against Fivesky discrimination and hostile work environment claims

based on race, sex, and religion under Title VII, New York State Human Rights Law

("NYSHRL"), and New York City Human Rights Law ("NYCHRL"), and retaliation claims

under Title VII, 42 U.S.C. § 1981, NYSHRL, and NYCHRL.[1]  Plaintiff brings against Pourkhomami discrimination and hostile work environment claims and retaliation claims under NYSHRL and NYCHRL, and a retaliation claim under 42 U.S.C. § 1981.  Plaintiff also alleges Pourkhomami is liable as an aider and abettor for discrimination, hostile work environment, and retaliation under NYSHRL and for discrimination and hostile work environment under NYCHRL.  As part of his discrimination claims, Plaintiff alleges he was subjected to a hostile work environment and that his ultimate decision to resign was a constructive discharge that also operated as an adverse action.

For the following reasons, the motion to dismiss is granted in part and denied in part. Plaintiff's discrimination, hostile work environment, and aider and abettor claims based on religion and his retaliation claims may proceed.  Plaintiff's remaining claims are dismissed.

## BACKGROUND

The Court accepts the pleaded facts as true on a motion to dismiss.

Fivesky is a New York-based information technology management and consulting company that offers IT solutions to an international customer base. AC ¶¶ 14, 16.  The Amended Complaint alleges Fivesky, LLC and Fivesky Technology Services, LLC were joint employers.  *Id.* ¶ 18.  Fivesky employs at least fifteen employees.  *Id.* ¶¶ 15, 17.  Defendant Pourkhomami is the principal, owner, and/or Chief Executive Officer of Fivesky and also served as Plaintiff's former manager and direct supervisor.  *Id.* ¶¶ 20, 23.

Plaintiff is a Caucasian male of the Jewish faith.  He began working at Fivesky in April 2017 as a Sales Director and/or Account Manager, reporting directly to Pourkhomami.  *Id.* ¶¶ 21, 23.  He alleges that "[f]rom the time that he was hired, [he] was exposed to a constant,

---

[1] Plaintiff's Title VII claims are brought only against Fivesky.  *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) ("Employers, not individuals, are liable under Title VII.").

continuous and ongoing racially, religious, and gender-based hostile work environment wherein he was subjected to ongoing and continuous racial/religious/sexual epithets, ridicule and insults, innuendo, situations and harassments and other unlawful acts." *Id.* ¶ 3.

Almost as soon as Plaintiff's employment began (in or around July 2017) and continuing until his resignation in March 2019, Pourkhomami made a number of comments in front of him that were racist, sexual in nature, or reflected religious bias. The racist comments used bigoted terms to refer to African Americans, Polish persons, and persons of Chinese descent. The sex-based allegations refer to comments about sexual activity, physical blood stains from sexual activity, and the sharing of pictures of male and female genitalia. The religious comments were directed at people of Jewish heritage.

Although the Amended Complaint intermingles the comments and discriminatory acts and alleges that they combined to create a hostile work environment, the Court discusses each category separately because it is important to the legal analysis.

A.    **Race-Based Conduct**

Plaintiff alleges that not long after he began his employment, and starting in or around July 2017, "Pourkhomami began to expose [him] to an ongoing, continuous, systematic and relentless discriminatory hostile work environment based on race, color, religion, sex, and gender." *Id.* ¶ 24. The first comments singled out by Plaintiff were racist. At a happy hour event in July 2017, Pourkhomami "took Plaintiff aside" and said, "[T]he only way to make real money [i]s by having all the brown people do all the work, and we bill the customer." *Id.* ¶ 25. Plaintiff alleges that "[f]rom that point forward, Plaintiff began to hear constant discriminatory and offensive comments from Defendant Pourkhomami – both inside and outside of the workplace." *Id.* ¶ 30.

Plaintiff identifies three African American employees who were the subjects of Pourkhomami's racist comments: Evan Jackson, an employee with the last name Levar, and an employee with the last name Delorian.  Pourkhomami "routinely referred" to Mr. Jackson "as a 'nigger' on a regular basis."  *Id.* ¶ 31.  Usually, those comments were made outside of Mr. Jackson's presence, but in front of other employees.  *Id.* ¶ 32.  On occasion, however, "Pourkhomami would call Mr. Jackson 'nigger' directly to his face."  *Id.* ¶ 33.  He "also texted and called Mr. Jackson 'Nigger' on the phone on multiple occasions."  *Id.* ¶ 69.  Plaintiff singles out one of these occasions.  In or around August 2018, while at a work event, with Plaintiff and another Caucasion employee, "Pourkhomami began to refer to Evan Jackson . . . several times as, 'our Nigger Evan Jackson.'"  *Id.* ¶ 68.  Pourkhomami showed Plaintiff and another Caucasian employee his text messages calling Mr. Jackson a "nigger."  *Id.* ¶ 70.  Pourkhamami also referred to Mr. Levar as "my niggah" or "my nigger," *id.* ¶ 74, and Plaintiff was told by another employee that Pourkhomami had also called Mr. Delorian a "Nigger," *id.* ¶ 140.

Pourkhomami's racist comments were open, notorious, and repeated.  He "continued to use the 'n-word' in and around the office and seemed to find the offensive word humorous and entertaining."  *Id.* ¶ 35.  He "continued to refer to African Americans (employees, as well as clients and business affiliates) as 'nigger(s)' throughout Plaintiff's employment."  *Id.* ¶ 36.  He would yell "racial epithets, in the workplace."  *Id.* ¶ 39.  At a client dinner in Montreal, Pourkhomami called one of the clients his "Nigger" or "my Niggah" "many times throughout the evening in a crowded restaurant."  *Id.* ¶ 93.  On another occasion, on or about January 18, 2019, while preparing for a client meeting, Pourkhomami yelled, "'[L]et's go Niggers!' at Plaintiff and the [employee] team."  *Id.* ¶ 117.  On yet a further occasion, at a birthday party for himself at his

apartment, "Pourkhomami was openly and outwardly using the word 'Nigger,' while referring to the only African American people at the party." *Id.* ¶¶ 136-37.

Plaintiff alleges that Pourkhomami made some of the racist comments to him and another Caucasian employee "because they were both Caucasian and Defendant Pourkhomami felt emboldened to be openly racist towards members of another race with his Caucasian and/or non-African American employees." *Id.* ¶ 72. Plaintiff also alleges that the racist comments made him "uncomfortable" for himself and for the individuals who were the subjects of the racial epithets, *id.* ¶¶ 26, 34, 37, including "the way it affected his coworkers," *id.* ¶ 37.

## B.    Sex-Based Conduct

Plaintiff makes the allegation that Pourkhomami "often discussed and/or forced his employees (such as Plaintiff) to be exposed to unwelcomed and unwanted sexual talk, discussions, innuendo, and/or situations." *Id.* ¶ 5.

He also alleges conduct of a sexual nature or sexual banter to which he was subject but which he claims was not made to similarly situated female employees. On one occasion, in early January 2018, Pourkhomami and Plaintiff were attending a business-related event in Las Vegas, Nevada and Pourkhomami asked Plaintiff if he wanted drugs and if he "needed prostitutes." *Id.* ¶¶ 44-48. Plaintiff declined the offer and avoided Pourkhomami for the rest of the evening, *id.* ¶ 50, but the following day when Plaintiff arrived at Pourhomami's room to deliver coffee, Pourkhomami directed Plaintiff's attention to bloodstains on the bed and said that they were a result of his having sex with an employee of one of Fivesky's vendors, *id.* ¶ 54. Plaintiff makes the conclusory allegation that Pourkhomami "showed Plaintiff the evidence of his sexual encounter with a vendor because Plaintiff is male" and that he "did not and would not have shown the display to female employees." *Id.* ¶¶ 58-59.

On another occasion, in or around August 2018, Pourkhomami and Plaintiff were at the U.S. Open tennis tournament. Pourkhomami showed Plaintiff naked pictures on his phone of Pourkhomami's girlfriend and Pourkhomami's penis, as well as naked pictures of a Fivesky female employee. *Id.* ¶¶ 75-78. Plaintiff alleges he "was made extremely uncomfortable" by these actions, that he was shown the pictures because he is male, and that Pourkhomami did not show the pictures to similarly situated female employees. *Id.* ¶¶ 79-83.

On another occasion, Plaintiff told Pourkhomami that he had anticipated Pourkhomami's request on a business matter and had already reached out to a customer/vendor. Pourkhomami responded, "[Y]ou just gave me a boner." *Id.* ¶¶ 129-35.

Two other allegations relate to conduct in front of Plaintiff and other male employees, but not female employees. Once, Pourkhomami showed Plaintiff and other male employees nude pictures of female employees. Plaintiff alleges Pourkhomami was "careful not to include female employees in the show and tell discussion." *Id.* ¶ 60.

On a further occasion, on or about February 13, 2019, Pourkhomami bragged about the shape and size of his penis to Plaintiff and other male employees, but did not do so to the female employees. *Id.* ¶¶ 124-25, 127. Plaintiff further alleges that on repeated occasions, Pourkhomami exposed Plaintiff to sexual banter, "mostly about Defendant Pourkhomami's penis being erect all the time, as well as mentioning the new girls that he was sleeping with," and the "sexual acts that he participates in with others." *Id.* ¶¶ 153-56. He also "showed nude photos of women to Plaintiff because Plaintiff is male." *Id.* ¶ 155.

## C.    Religion-Based Conduct

Plaintiff alleges that "on a weekly basis . . . Pourkhomami made open derogatory comments and insults against Jewish people/faith, Chinese/Asians, African Americans, and Polish persons," and that "Pourkhomami's favorite persons/people to attack were/are persons of

the Jewish faith – often referring to Plaintiff and others as 'Fuckin Jew' and/or 'Cheap Jew' and or other derogatory variations of the term in the workplace and in front of Plaintiff's coworkers." *Id.* ¶ 4.

Plaintiff also alleges that on "multiple occasions, including on or about September 6, 2018," Pourkhomami referred to Plaintiff as a "cheap Jew" and that he made "repeated reference to Plaintiff as a 'cheap Jew'" including in front of another Fivesky employee. *Id.* ¶¶ 87-88; *see also id.* ¶ 90 (Defendant made "repeated derogatory reference[s]" to Plaintiff's religion). He alleges that the references to him as a "cheap Jew" occurred "over an extended period of time" and caused him deep offense and bewilderment. *Id.* ¶¶ 90, 92.

The Amended Complaint singles out two specific examples of instances in which Pourkhomami made derogatory and anti-Semitic comments to Plaintiff. One occurred on September 6, 2018. *Id.* ¶ 87. The second occurred on or about February 28, 2019, when Pourkhomami stated he "couldn't believe he was working on this proposal with a fuckin Jew and a Polack," referring to Plaintiff as the former. *Id.* ¶ 142. When Plaintiff asked Pourkhomami to "stop using that reference [of] fuckin Jew," Pourkhomami stated that he is "a Muslim," and he could say and do whatever he wanted about Jewish people. *Id.* ¶ 143.

Plaintiff alleges that these comments revealed that Pourkhomami, who is Muslim, held discriminatory animus towards Jewish individuals. *Id.* ¶ 146.

**D.     Plaintiff's Complaints and the Constructive Discharge**

Although Plaintiff alleges the initial comments from Pourkhomami made him uncomfortable, he states that, over time, "[t]he hostile work environment became so severe and pervasive for Plaintiff that Plaintiff began to suffer from anxiety and other emotional issues." *Id.* ¶ 6; *see also id.* ¶¶ 147-48 ("After being told on multiple occasions that Defendant Pourkhomami could do whatever he wanted, Plaintiff felt helpless, extremely anxious, and found it difficult to

report to the office to work" and "began to experience severe anxiety, depression, and other emotional injuries due to the continued conduct"). "Pourkhomami's behavior began to affect Plaintiff in adverse ways, physically, mentally and emotionally," *id.* ¶ 110, and Plaintiff began to experience severe anxiety and depression, *id.* ¶¶ 111, 148.

Plaintiff had previously objected to Pourkhomami's conduct to his face, on behalf of himself and Mr. Jackson, telling Pourkhomami, "[Y]ou can't do that." *Id.* ¶ 34. On another occasion, in response to Pourkhomami yelling racial epithets, "Plaintiff objected to the unlawful conduct by stating, 'stop doing this. This is not cool.'" *Id.* ¶ 39. In 2018, Plaintiff expressed his concern to a manager who responded, "[J]ust do your job and move on." *Id.* ¶¶ 62-63.

"In or around December 2018, after enduring a constant hostile work environment . . . for over a year," Plaintiff spoke to Pourkhomami and told him that his actions and the hostile work environment were "offensive, discriminatory, and made Plaintiff feel uncomfortable." *Id.* ¶ 112. Plaintiff also warned Pourkhomami that his behavior could lead to consequences with new customers and Fivesky's vendors. *Id.* ¶ 113. Pourkhomami got "extremely aggravated" and "ended the conversation abruptly." *Id.* ¶ 114.

Plaintiff alleges that, in late January 2019, in retaliation for Plaintiff's complaints, Pourkhomami spiked Plaintiff's coffee with hot sauce, burning Plaintiff's throat. *Id.* ¶¶ 122-23. Plaintiff continued to complain, including in February 2019, when he told Pourkhomami that he "need[ed] to stop using that reference – fuckin Jew." *Id.* ¶ 143. Pourkhomami responded that he was a Muslim and "he [can] say [and] do whatever he wants." *Id.* ¶ 144.

Pourkhomami's offensive and discriminatory behavior continued after these complaints, *id.* ¶ 115, and, in fact, "Pourkhomami's conduct . . . became more hostile after Plaintiff's numerous complaints," *id.* ¶ 158. "On an almost weekly basis, Defendant Pourkhomami

threatened employees' employments – thus adding to Plaintiff's fear that he would be terminated, or threatened therewith, for continuing to complaint about Defendant Pourkhomami's discriminatory conduct." *Id.* ¶ 159.

At some point, Plaintiff began seeking medical assistance for his ongoing anxiety issues and his doctor recommended that he remove himself "from the toxic environment." *Id.* ¶ 149. He was diagnosed with anxiety and other emotional issues and was prescribed medication. *Id.* ¶ 164.  In or about March 2019, Plaintiff presented his doctor's note to Fivesky asking for time off work.  *Id.* ¶ 149.  He also included a written complaint of discrimination.  *Id.* ¶ 150.  In or around March 2019, Plaintiff took medical leave and felt unable to return to work because of the environment.  *Id.* ¶ 165.

Plaintiff claims that he was "constructively discharged as the environment became so intolerable that Plaintiff was compelled to leave."  *Id.* ¶ 166.  He also alleges that "Defendants constructively discharged Plaintiff in retaliation for his complaints of discrimination and engagement in protected activities."  *Id.* ¶ 167.

## LEGAL STANDARDS

### A.    Motion to Dismiss

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether

"[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx v. Siracusano*, 563 U.S. 27, 46 (2011).

**B.     Title VII**

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As the case law has developed, Title VII prohibits two different forms of discrimination.

**1.      Hostile Work Environment**

Because Title VII's prohibition against discrimination in the "terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), "is not limited to 'economic' or 'tangible' discrimination," *Meritor Savings Bank, FSB, v. Vinson*, 477 U.S. 57, 64 (1986), the statute also makes it unlawful for an employer to require an employee to work in a discriminatorily hostile or abusive environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To establish a hostile work environment, a plaintiff must that a defendant's conduct: (1) was objectively severe or pervasive in that it created an environment that a reasonable person would find hostile or abusive; (2) created an environment that the plaintiff subjectively perceived as hostile or abusive; and (3) occurred because of the plaintiff's protected characteristic. *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). Conduct that is offensive but that is directed at and impacts

members of protected classes equally is not actionable under Title VII.  "Put bluntly, the equal opportunity harasser escapes the purview of Title VII liability."  *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 n.88 (2d Cir. 2019) (quoting *Brown v. Henderson*, 115 F. Supp. 2d 445, 450 (S.D.N.Y. 2000)).

Objective severity "can be determined only by looking at all of the circumstances[, including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23; *see Patane*, 508 F.3d at 113. "[A] plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions."  *Redd v. New York Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (citation and quotation marks omitted).  But while "even a single episode of harassment can establish a hostile work environment if the incident is sufficiently 'severe,'" *Redd*, 678 F.3d at 176, a workplace is hostile or abusive only if it "is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment,'" *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (quoting *Harris*, 510 U.S. at 21).

Finally, "a hostile environment is [not] something that exists in some absolute way, like poisonous chemicals in the air, affecting everyone who comes in contact with it."  *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010) (Lynch, J. sitting by designation). Plaintiff himself must be the target of the hostile work environment and subjected to the hostility *because of* membership in a protected class.  *Cruz*, 202 F.3d at 570; *see Brennan v. Metropolitan Opera Ass'n Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) ("In other words, an environment which is

equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes."); *see also Redd*, 678 F.3d at 175 (same). As Circuit Judge Lynch, then sitting as a district judge by designation, put it: "The prohibited causal factor requirement . . . flows directly from the text of Title VII, and from the very essence of its nature as an *anti-discrimination* law." *Krasner*, 680 F. Supp. 2d at 513. "The prohibited causal factor requirement makes clear that a . . . 'hostile environment' in the Title VII context is not one that is bad for all living things in a manner that happens to involve [characteristics of the protected class]; rather it is one that is *discriminatorily* hostile to an employee based on *his or her* [membership in the protected class]." *Id.* at 514.[2]

### 2.      Adverse Employment Action Discrimination

Title VII makes it unlawful for an employer to take an adverse employment action against an employee because of the employee's membership in a protected class. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). A plaintiff asserting a discrimination claim under Title VII must allege two elements: "(1) the employer discriminated against him (2) because of his race, color, religion, sex, or national origin." *Id.*

An adverse employment action is a "materially adverse change in the terms of conditions of employment." *Id.* at 85 (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). It is "one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a

---

[2] Judge Lynch made his comments in the context of a claim of a sexually hostile work environment and the word in brackets is "sex," but the observation applies equally with respect to hostile work environments based on race or religion.

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.*

The action must be "'because of' a plaintiff's race, color, religion, sex, or national origin," which means that the protected characteristic "was a 'substantial' or 'motivating' factor contributing to the employer's decision to take the action." *Id.* at 85. A plaintiff can meet his burden of showing that the adverse employment decision was motivated at least in part by an impermissible reason "through direct evidence of intent to discriminate or by indirectly showing circumstances giving rise to an inference of discrimination." *Id.* at 87. In the absence of "direct evidence of discrimination," such an inference can rise from the pleading of facts that would plausibly support "that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and [that there is] at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

At the motion to dismiss stage, a plaintiff "need only give plausible support to a minimal inference of discriminatory motivation.'" *Vega*, 801 F.3d at 84; *see also McDonnell Douglas v. Green*, 411 U.S. 792, 802-804 (1973). "An inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn*, 795 F.3d at 312 (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). "[A]n inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Id.* at 312-13.

C.      **Retaliation**

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Section 1981 prohibits retaliation under the following provision: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a); *see CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008) (holding that Section 1981 applies to retaliation claims). The standard is the same for retaliation claims brought under Title VII and 42 U.S.C. § 1981. *See Littlejohn*, 795 F.3d at 315.

To survive a motion to dismiss, the plaintiff must plausibly allege that defendants discriminated—or took an adverse employment action—against him because he has opposed an unlawful employment practice. *Vega*, 801 F.3d at 90. Stated otherwise, a plaintiff must allege: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 315-16.

To properly allege the first element, plaintiff "need not prove that the conditions against which he protested actually amounted to a violation of Title VII." *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134 (2d Cir.), *cert denied*, 528 U.S. 964 (1999). It is sufficient that he had a good faith reasonable belief that the underlying challenged actions of the employer violated the law. *Id.* Protected activity includes "informal protests of discriminatory employment practices, including making complaints to management," *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990), but generalized complaints about a supervisor's

treatment unrelated to Title VII are not sufficient, *Mejia v. White Plains Self Storage Corp.*, 2020 WL 247995, at *6 (S.D.N.Y. Jan. 16, 2020) (collecting cases).  Similarly, although complaints need not mention discrimination or use particular language, ambiguous complaints must make the employer aware of the alleged discriminatory misconduct to put the employer on notice.  *See, e.g.*, *Mejia*, 2020 WL 247995, at *6; *Int'l Healthcare Exch. Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007).

As to the third element, in the context of a retaliation claim, an adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N.*, 548 U.S. at 68; *see Vega*, 801 F.3d at 90.  "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII," *Vega*, 801 F.3d at 90, in that it is "not limited to discrimination actions that affect the terms and conditions of employment," *id.* (quoting *Burlington N.*, 548 U.S. at 64).  *See also Patane*, 508 F.3d at 116.

Finally, Plaintiff must plead "but-for" causation such "that the adverse action would not have occurred in the absence of the retaliatory motive."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360-61 (2013).  This element can be "shown indirectly by timing: protected activity followed closely in time by adverse employment action."  *Vega*, 801 F.3d at 90.

**D.     New York State Human Rights Law**

The language in the NYSHRL is similar to that of Title VII, and as a result, the standards for discrimination, hostile work environment, and retaliation claims are the same as under Title VII.  *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006).

The NYSHRL makes it unlawful for an employer, "because of an individual's . . . race, creed, [or] . . . sex, . . . to refuse to hire or employ or to bar or to discharge from employment

such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1).  It prohibits retaliation by making it unlawful for "any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he has opposed any practices forbidden under this article."  N.Y. Exec. Law § 296(7).

It also imposes aiding and abetting liability: "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. Exec. Law § 296(6).

### E.       New York City Human Rights Law

The NYCHRL was amended as part of the Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85, (the "Restoration Act") with instructions that its "provisions . . . shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed."  N.Y. Admin. Code § 8-130(a).  Courts are instructed to view interpretations of federal or New York state statutes with similar wording "as a floor below which the City's Human Rights cannot fall."  *Loeffler v. Staten Island Uni. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting N.Y.C Local L. No. 85 § 1).

NYCHRL makes it unlawful for an employer, employee, or agent thereof, "because of the actual or perceived . . . race, creed[, or] . . . gender, . . . [t]o refuse to hire or employ or to bar or to discharge from employment such person; or [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment."  N.Y. Admin. Code § 8-107(1).  The Restoration Act added "partnership status" to the list of protected characteristics but did not otherwise revise this anti-discrimination provision.  *See* N.Y.C Local L. No. 85 § 1.

16

Because the Restoration Act states that NYCHRL provisions are to be construed independently from similar or identical provisions of federal or New York statutes, *id.*, courts have held that discrimination claims brought under the NYCHRL do not require a materially adverse employment action, and with respect to hostile work environment claims, the "severe or pervasive standard of liability no longer applies to NYCHRL" but is "relevant only to the scope of damages," *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 114 (2d Cir. 2013).

Retaliation is also prohibited under the NYCHRL: "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter." N.Y. Admin. Code § 8-107(7). The Restoration Act amended NYCHRL to add that retaliation "need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment." N.Y.C Local L. No. 85 § 3; N.Y. Admin. Code § 8-107(7). However, the retaliation must still be "reasonably likely to deter a person from engaging in protected activity." N.Y.C Local L. No. 85 § 3; N.Y. Admin. Code § 8-107(7).

With respect to aiding and abetting liability, NYCHRL contains language identical to that of the NYSHRL, which was not amended and which courts have held to apply the same standard as the NYSHRL. *See Schaper v. Bronx Lebanon Hospital* Center, 408 F. Supp. 3d 379, 396 (S.D.N.Y. 2019) (noting that the same standard applies to both statutes); *see also Feingold v. New York*, 366 F.3d 138, 158-59 (2d Cir. 2004) (same).

## DISCUSSION

### A. Timeliness of Claims

A plaintiff bringing a Title VII claim in federal court must file a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") within 180 days or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, within 300 calendar days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see Vega*, 801 F.3d at 78-79.[3]

The word "practice" refers to "a discrete act or single 'occurrence.'"  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-11 (2002).  A discrete discriminatory or retaliatory act that occurs within the time limitations period is not barred if it occurred as "part of an ongoing pattern of discrimination or retaliation" that began outside the statutory period. *Vega*, 801 F.3d at 79.  In the case of a hostile work environment claim that necessarily involves repeated conduct, plaintiff may allege only one act demonstrating the challenged work environment occurred within 300 days of filing; once that is shown, a court may consider "the entire time period of the hostile environment . . . for the purposes of determining liability."  *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117 (discussing the continuing violation doctrine).

Moreover, where a plaintiff alleges that "he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign" (*i.e.*, where the plaintiff alleges that defendants' discriminatory acts resulted in a constructive discharge), the statute of limitations begins to run only after the plaintiff resigns, and statute of limitations on the discriminatory conduct that led to that resignation begins to run on that date as

---

[3] In contrast, the four-year statute of limitations under 28 U.S.C. § 1658(a) applies to Plaintiff's retaliation claim brought under 42 U.S.C. § 1981.  *See Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 383 (2004).

well.  *Green v. Brennan*, 136 S. Ct. 1769, 1777-78 (2016).  For these purposes, indefinite

medical leave does not constitute resignation.  *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65,

72 (2d Cir. 2019).

Plaintiff has not pled the exact date on which he gave notice to his employer that he

would not be returning to work.  He pleads that he was employed from "April 2018 to March

2019."[4]  AC ¶ 2.  He further pleads that he took "medical leave in or about March 2019," *id.*

¶ 164, and that he was "unable to return to work" "[i]n or about March 2019," *id.* ¶ 165.  The

Amended Complaint then states that "Plaintiff was forced to go on leave and [was] subsequently

constructively discharged."  *Id.* ¶ 169.  He filed his Charge with the EEOC in May 2019.  *Id.*

¶ 11.  The Court construes Plaintiff's allegations about his period of employment and that he was

"subsequently constructively discharged" to mean that Plaintiff resigned in or around March

2019.  *See* Fed R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."); *see also* Opp.

at 1 ("Mr. Sherman resigned from his position.").[5]

Regardless of the exact date he gave notice in March, Plaintiff's Charge filed in May

would have been within 300 days after his alleged constructive discharge in March, which was

the last unlawful employment practice as part of his discrimination, hostile work environment,

and retaliation claims.  Defendants do not raise exhaustion of administrative remedies as an

affirmative defense.  *See Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 490-91 (2d

---

[4] The Amended Complaint elsewhere says that Plaintiff began working at Fivesky "in or around
April 2017."  AC ¶ 21.  Given that Plaintiff alleges acts occurring in 2017, the Court assumes
that April 2017 is the correct starting date.

[5] Defendants do not argue that Plaintiff did not in fact resign, but suggest that it could have
occurred "months and months later" than March 2019.  MTD at 23.  The Court is required to
accept the facts as true on a motion to dismiss.  If, at a later stage, Plaintiff reveals that his
resignation did not occur in March 2019 but rather much later than the alleged unlawful
employment acts, some of his claims may not survive.

Cir. 2018) (district court erroneously dismissed complaint by holding the exhaustion requirement

was a pleading requirement incumbent on a Title VII plaintiff); *see also Ft. Bend Cty., Tex. v.*

*Davis*, 139 S. Ct. 1843, 1850-52 (2019).  And even if Plaintiff had not filed his Charge within the

time period, the Second Circuit has held that administrative exhaustion in this context is not a

jurisdictional prerequisite to filing suit, though the Court does not decide that issue here.  *See*

*Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 385 (2d Cir. 2014).

**B.      Hostile Work Environment**

**1.   Race-Based Hostile Work Environment**

Plaintiff's allegations that Pourkhomami made racist and derogatory comments about

members of other protected classes do not make out a claim that Plaintiff was subject to a hostile

work environment or that Pourkhomami discriminated against him "because of" his race in

violation of Title VII.

Plaintiff alleges that such comments were made to him "because Plaintiff is Caucasian,"

but the facts pled demonstrate that Pourkhomami made these comments in an indiscriminate

manner both to Caucasian and non-Caucasian employees "inside and outside of the workplace,"

"in and around the office," and "at a work event," AC ¶¶ 30, 35, 68, "in front of other

employees," "coworkers" and "the team," *id.* ¶¶ 32, 38, 117, "on occasion" in front of Mr.

Jackson, *id.* ¶¶ 33, 73, and also to "clients and business affiliates," *id.* ¶ 36.  *See also id.* ¶ 39

(alleging that Pourkhomami would "yell racial epithets, in the workplace").  Pourkhomami's

comments conveyed a negative or hostile view about members outside of Plaintiff's class—

namely African Americans and persons of Chinese descent.  *See id.* ¶ 67 ("Pourkhomami

exclaimed, 'I've got the stupidest chinks working for me.'").  The comments are not alleged to

disadvantage or express hostility towards Plaintiff's own race; at most, they made Plaintiff feel

uncomfortable in the same way that any other person would take offense.  *See id.* ¶ 34 (the

comments made Plaintiff "uncomfortable for himself and Mr. Jackson"); *id.* ¶ 28 (Pourkhomami "felt emboldened to say offensive comments about 'brown people' because Plaintiff was Caucasian and not one of the 'brown people'"); *id.* ¶ 72 ("Defendant Pourkhomami showed Plaintiff and Mr. Sharkey the racist text messages because they were both Caucasian and Defendant Pourkhomami felt emboldened to be openly racist towards members of another race with his Caucasian and/or non-African American employees").[6]

Plaintiff's "concern for a [non-Caucasian employee]'s right to be free of workplace discrimination, and offense taken upon being surrounded by conduct believed to impinge on that right, admirable as it may be, does not make [Plaintiff] himself a victim of . . . discrimination within the scope of Title VII's protections." *Krasner*, 680 F. Supp. 2d at 515; *see Smith v. AVSC Int'l, Inc.*, 148 F. Supp. 2d 302, 311 (S.D.N.Y. 2001) (dismissing hostile work environment claim by Caucasian male about harassment of women and minority employees); *see also Smith v. Blavatnik*, 2014 WL 3739689, at *5-6 (S.D.N.Y. July 30, 2014) (concluding that male from the United Kingdom could not assert claim based on discrimination against female job applicants from the Philippines). Taking the allegations of the Amended Complaint as true, while certainly racist, Pourkhomami's comments neither expressed hostility to Plaintiff's own race nor were they made to Plaintiff because of his race.

---

[6] Defendants also argue that, as a Caucasian man, Plaintiff lacks statutory standing to bring a Title VII complaint alleging discrimination with respect to African Americans. Several other circuits have so held. *See Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176 (7th Cir. 1998); *Childress v. City of Richmond*, 134 F.3d 1205, 1209 (4th Cir. 1998) (en banc) (Luttig, J., concurring); *Patee v. Pacific Northwest Bell Telephone Co.*, 803 F.2d 476, 478 (9th Cir. 1986). The Second Circuit has not directly decided the issue, instead suggesting that a plaintiff who is not himself subject to discrimination cannot bring hostile work environment claims on behalf of others. *See Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 187-88 (2d Cir. 2001); *Wimmer*, 176 F.3d at 136 n.5. Because Plaintiff here has not adequately alleged that Defendants' conduct was discriminatory against him because of his race, this Court also need not decide the statutory standing question here.

2.        **Sex-Based Hostile Work Environment**

Plaintiff's claim that he was subjected to a same sex hostile work environment also lacks

merit.  To allege discrimination because of sex, a plaintiff may allege that: (1) the harasser is

homosexual such that the conduct could be deemed to involve explicit or implicit proposals of

sexual activity; (2) the victim is harassed in such sex-specific and derogatory terms by someone

of the same gender as to make it clear that the harasser is motivated by general hostility to the

presence of someone of the same gender in the workplace; or (3) constitutes direct comparative

evidence about how the alleged harasser treated members of both sexes in a mixed-sex

workplace.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 76, 80-81 (1998).  But those

allegations are not a sufficient condition of a hostile work environment claim.  "Whatever

evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct

was not merely tinged with offensive sexual connotations, but actually constituted

'discrimination . . . because of . . . sex.'"  *Oncale*, 523 U.S. at 81.

Plaintiff does not argue that Pourkhomami is homosexual or that Pourkhomami harassed

him in such sex-specific or derogatory terms to make it clear he was motivated by general

hostility to the male sex.  Nor would the factual allegations support such claims.  Instead,

Plaintiff argues that Pourkhomami made derogatory comments about women to him that

Pourkhomami did not make to the female employees of Fivesky and shared pictures of naked

women with him that Pourkhomami did not share with the female employees of Fivesky.

*Oncale*, however, makes clear that not every different treatment of similarly situated men

and women in a mixed-sex workplace constitutes discrimination against the man.  Something

more is required.  The disparate treatment has to reflect discrimination against the plaintiff as a

member of the protected class—it has to constitute discrimination because of sex.  *See Brown*,

257 F.3d at 252 ("[T]he courts have consistently emphasized that the ultimate issue is the reason

for the individual plaintiff's treatment, not the relative treatment of different groups within the workplace."); *see also Krasner*, 680 F. Supp. 2d at 513 (emphasizing the "prohibited causal factor requirement" in Title VII); *Dingle v. Bimbo Bakeries*, 2012 WL 2872161, at \*5 (E.D.N.Y. July 12, 2012) (despite nude pictures and comments about the size of plaintiff's genitalia, only plaintiff was targeted, and no other men, which suggested personal animus at best).  Or as Circuit Judge Lynch put it, the disparate treatment must put "an unfair burden on male employees" as a result of their sex.  *Krasner*, 680 F. Supp. 2d at 514.  Moreover, courts have "never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."  *Oncale*, 523 U.S. at 80.

The isolated instances reflected in the Amended Complaint do not satisfy that standard.  Certain of the conduct alleged in the Amended Complaint—the visit to Las Vegas, the trip to the U.S. Open, the comment about a "boner"—is precisely the type of "conduct . . . tinged with offensive sexual connotations" that the Supreme Court has held is insufficient to make out a claim of a discriminatory hostile work environment.  *Oncale,* 523 U.S. at 80-81.  That Pourkhomami would not have engaged in the same conduct with female employees does not mean that Pourkhomami chose to subject Plaintiff to the conduct because he was a man or that he intended to degrade or discriminate against Plaintiff because of his sex.  There is no allegation that men generally as a class were subjected to these comments.  The "occasional banter, tinged with sexual innuendo, of coarse or boorish workers," *Redd*, 678 F.3d at 177, does not make Plaintiff himself the victim of discrimination.

As to the allegations that Pourkhomami shared nude pictures of female employees on one occasion, AC ¶ 60, and bragged with male employees about his sexual exploits and the size of

his penis, *id.* ¶¶ 124, 153-55, the display of pictures of naked people can, of course and depending on the context or circumstances, create a hostile working environment based on sex. *See, e.g.*, *Nachmany v. FXCM, Inc.*, 2020 WL 178413, at *6-7 (S.D.N.Y. Jan. 9, 2020) (granting leave to replead whether derogatory message, picture of naked male, drawing offensive sexual images onto a picture of plaintiff, and berating offensive slang terms were targeted only at male employees); *Ruiz v. City of New York*, 2015 WL 5146629, at *9 (S.D.N.Y. Sept. 2, 2015) (male employee circulated a text message depicting an image of female plaintiff's face photoshopped onto a naked woman's body); *Sawka v. ADP, Inc.*, 2015 WL 5708571, at *11 (D. Conn. Sept. 29, 2015) (male employees made explicit references to male plaintiff's anatomy in nude pictures). But the circumstances in which they do so are ones where they "create[] a working environment that [is] hostile to [the plaintiff] on the basis of [the plaintiff's membership in a protected class]," *i.e.*, where the content of the material victimizes the recipient. *Cruz*, 202 F.3d at 571.

Although the female employees at Fivesky might have had a valid complaint, Plaintiff does not. The Amended Complaint does not allege that the display of the pictures was motivated by discrimination against men generally or Plaintiff because he was a man, that it was intended to or did create an environment that was discriminatory against men and Plaintiff in his capacity as a member of the protected class of men, or that it advantaged women at the expense of men in the Fivesky workplace. It thus fails the *Oncale* requirement that even where Plaintiff presents direct evidence that men are treated differently from women in a mixed-sex workplace and are exposed to "conduct . . . tinged with offensive sexual connotations," the Plaintiff must also show that the differential treatment constituted discrimination because of sex. *Oncale,* 523 U.S. at 80-81. Plaintiff can no more complain under Title VII that Pourkhomami's display to him of degrading and hostile pictures of women (that Pourkhomami would not have shown directly to a

woman) was unwanted and uncomfortable and therefore constitutes discrimination against him as a man than he can complain that he was the victim of discrimination by being exposed to language hostile to members of some other protected class that would not have been said directly to members of that protected class.  That Pourkhomami felt comfortable sharing the pictures with Plaintiff and avoided showing these pictures to any woman, perhaps for fear that the pictures, "if only directed at [wo]men . . . could have themselves constituted sexual harassment," does not make Plaintiff a victim of discrimination against men.  *Cobb v. Morningside at Home, Inc.*, 2009 WL 874612, at *9 (S.D.N.Y. 2009) (holding that female plaintiff could not bring hostile work environment claim based on the theory that she was subject to hostile comments about men to which the defendant did not subject the men because those comments if made to men might themselves have constituted male sexual harassment); *see also Borski v. Staten Island Rapid Transit*, 2006 WL 3681142, at *3 (E.D.N.Y. Dec. 11, 2006) (sharing of sexually explicit material and vile material on bulletin boards did not indicate that men were exposed to advantageous terms or conditions of employment because of their sex).

As Judge Lynch put it in *Krasner*, "Title VII does not prohibit employers from maintaining nasty, unpleasant workplaces, or even ones that are unpleasant for reasons that are sexual in nature."  680 F. Supp. 2d at 513.  "The prohibited causal factor requirement makes clear that a sexually 'hostile environment' in the Title VII context is not one that is bad for all living things in a manner that happens to involve sex; rather, it is one that is *discriminatorily* hostile to an employee based on *his or her* sex."  *Id.* at 514.

### 3. Religion-Based Hostile Work Environment

Plaintiff has pled the elements to satisfy a claim of hostile work environment based on religion.  Pourkhomami's comments specifically invoked Plaintiff's religious faith and were

25

made "because of" that religion; his comments included negative stereotypes of Jewish people and dismay at having to work with someone of the Jewish faith.

Plaintiff has pled that these comments were objectively severe or pervasive enough to alter the terms and conditions of his employment.  Pourkhomami levelled against Plaintiff the unambiguous and ancient religious epithet of "cheap Jew" that dates even before Shakespeare used it in *The Merchant of Venice* and which "invoke[es] a long-standing negative stereotype of Jews as money hoarders."  *Weiss v. Dep't of Educ. of City of New York*, 2012 WL 1059676, at *6 (S.D.N.Y. Mar. 29, 2012); *see also Feingold*, 366 F.3d at 150 (mocking of Jewish-sounding names, comments about Jewish lawyers, and referring to "Jewish pig food"); *cf. Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 439 (2d Cir. 1999) ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' . . ."), *abrogated on other grounds by Burlington N.*, 548 U.S. at 60.  He has further pled that discriminatory and hostile conduct towards him was pervasive: it occurred "on a weekly basis," AC ¶ 4, "[o]n multiple occasions," *id.* ¶ 87, and "over an extended period of time," *id.* ¶ 92.[7]  *See Finkelshteyn v. Staten*

---

[7] The Court thus rejects Defendants' argument, made at oral argument, that Plaintiff was prohibited from identifying examples of discriminatory comments and then alleging that similar comments were made repeatedly or weekly.  Title VII claims are not like securities fraud claims where the Second Circuit has held that under Fed. R. Civ. P. 9(b) the plaintiff must specify each statement alleged to be fraudulent and unlawful.  *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).  The plaintiff in a Title VII case need only make "a short and plain statement of the claim showing that the pleader is entitled to relief," *Twombly*, 550 U.S. at 555, and the Second Circuit has held that at the pleading stage, Plaintiff is require to plead only "some minimal evidence" suggesting an inference of discrimination.  *Littlejohn*, 795 F.3d at 307.  The Court appreciates Defendants' concern that a plaintiff who has experienced only a single hostile comment and was not a victim of Title VII would still be able to manufacture a claim where none otherwise would exist by the rote incantation that the comment was made "on other occasions."  But Plaintiff himself admitted that if he was not able to identify other instances in deposition (even without the specifics of a date), he would be subject to a summary judgment motion.  The Court agrees that the time for weeding out such claims is at the summary judgment

*Island Univ. Hosp.*, 687 F. Supp. 2d 66, 79 (E.D.N.Y. 2009) ("[A]lthough this Court is not prepared to say that three instances of racist remarks over the two-year period complained of necessarily constitute an environment of pervasive hostility, [plaintiff]'s contention is that [defendant]'s bigoted commentary was a matter of routine."); *see also Feingold*, 366 F.3d at 150 (plaintiff alleged anti-Semitic comments were routine and that he was singled out on an "almost daily" basis on account of his religion).  Plaintiff has also alleged that he subjectively perceived these comments as hostile and they unreasonably interfered with his ability to perform his job. The comments caused anxiety and discomfort to Plaintiff such that they impacted his psychological well-being and resulted in medical leave.  AC ¶¶ 92, 146-50; *see Bogart v. N.Y.C. Law Dep't*, 2001 WL 1631986, at *5 (S.D.N.Y. Dec. 20, 2001) (sustaining allegations of hostile work environment based on anti-Semitic comments made during at least one meeting).

The cases upon which Defendant rely are not apposite.  *See* MTD at 17; Reply at 6-7.  In *Ekerman v. City of Chicago*, the court granted defendants' motion for summary judgment on plaintiff's religious hostile work environment claim but only because the plaintiff there was subject to a single isolated anti-Semitic comment from a co-worker (not a supervisor) with whom she had encountered no other problems and which was not repeated by anyone else at her place of employ.  2003 WL 1193262, at *2 (N.D. Ill. Mar. 13, 2003).  The court held that "[a] single isolated comment is not enough to alter the condition of one's employment."  *Id.*  The present case arises on a motion to dismiss, and the only similarity between *Ekerman* and this case is the anti-Semitic slur; Plaintiff here alleges that he was subject to anti-Semitic slurs on a repeated basis, every week, and that it was made by his direct supervisor.  *Aronson v. Health Care Excel*

---

stage and not at the pleading stage before Plaintiff has had the chance to present his case, be tested in deposition, and take discovery.

also involved summary judgment; the court permitted discovery but ultimately granted judgment

for defendants on a religious hostile work environment claim because plaintiff was not able to

adduce specific facts regarding her alleged harassment other than "relatively isolated instances"

over a several year period.  2007 WL 3091579, at *7-8 (S.D. Ind. Oct. 19, 2007).  It does not

support precluding Plaintiff from discovery on his claim.  And, in *Shabat v. Blue Cross Blue*

*Shield*, the comments about which plaintiff complained were occasional and not repeated, and

some did not make any reference whatsoever to plaintiff's religion but reflected "nothing more

than . . . a clash of personalities."  925 F. Supp. 977, 982 (W.D.N.Y. 1996), *aff'd sub. nom.*

*Shabat v. Billotti*, 108 F.3d 1370 (2d Cir. 1997).  On these facts, the court granted summary

judgment. [8]

If Plaintiff here is unable to support his allegations that there were repeated religious slurs

of a serious nature and if the comments reflect nothing more than a clash of personalities, he too

will be subject to a summary judgment motion.  But that is not what he alleges.  And, on the

facts he alleges, he is entitled to conduct discovery.

## C.      Adverse Employment Action

For Plaintiff's discrimination claims to proceed, Plaintiff must adequately plead that his

resignation in March 2019 was a constructive discharge that acted as an adverse employment

action and that his race, sex, and religion were motivating factors in his decision to resign.

Constructive discharge "occurs when an employer, rather than directly discharging an

individual, intentionally creates an intolerable work atmosphere that forces an employee to quit

---

[8] In the other cases cited by Defendants, plaintiffs did not bring a hostile work environment claim based on religion.  *See* MTD at 17 (citing *Francis v. Chemical Banking Corp.*, 62 F. Supp. 2d 948 (E.D.N.Y. 1999)); Reply at 7 (citing *Weston v. Optima Commc'n. Sys., Inc.*, 2009 WL 3200653 (S.D.NY. Oct. 7, 2009) and *Argeropoulos v. Exide Tech.*, 2009 WL 2132443 (E.D.N.Y. 2009)).

involuntarily." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996).  The first part of that standard requires that the employer "intended to create intolerable workplace conditions," not that it intended for a plaintiff to resign.  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73-74 (2d Cir. 2000) (no intent where defendant demonstrated an interest in retaining plaintiffs).  Courts have held that intent requires something "beyond mere negligence or ineffectiveness," such as engaging in a pattern of baseless criticisms against plaintiff or evincing a lack of concern about a plaintiff's complaints.  *Id.* at 74 (collecting cases).  The second part states that a work atmosphere is "intolerable" if it is "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Id.* at 73.

Plaintiff has plausibly alleged that Pourkhomami's offensive and frequent comments about Plaintiff's religion were intended to create intolerable working conditions.  Plaintiff has also established that the work environment was hostile because of his religion.  *See, e.g.*, *Rosen v. N.Y.C. Dep't of Edu.*, 2019 WL 4039958, at *7 (S.D.N.Y. Aug. 27, 2019) (level of conduct sufficient to demonstrate hostile work environment can lend support to a constructive discharge claim).  The Amended Complaint alleges that Pourkhomami continued to use the derogatory reference of "cheap Jew" and laughed each time it was used notwithstanding (and plausibly because of) Plaintiff's complaints about these religious slurs, AC ¶¶ 90-91, and later referred to Plaintiff as a "fuckin Jew," *id.* ¶ 142, even after Plaintiff complained to Pourkhomami about his "discriminatory conduct," *id.* ¶¶ 112-15.  As a result, there was no "apparent alternative to resignation, inasmuch as Plaintiff had made multiple complaints" to Pourkhomami "to no avail." *Ibrahim v. Fid. Brokerage Servs. LLC*, 2020 WL 107104, at *8 (S.D.N.Y. Jan. 9, 2020).

Plaintiff also has plausibly alleged that religion was a motivating factor in the constructive discharge.  As described above, Plaintiff has pled circumstances giving rise to an

inference of religious discrimination: he has alleged facts plausibly describing employment conditions that would have led someone in a similar situation to resign, *i.e.*, that he was forced to work directly with a CEO who made bigoted comments towards the Jewish religion and expressed dismay at working with someone of the Jewish religion.  Such comments occurred on an "almost weekly basis" and "became more hostile after Plaintiff's numerous complaints," including in December 2018.  AC ¶¶ 158-59.

Plaintiff has not pled facts that would support an inference of discriminatory intent based on his race or sex for reasons more fully elaborated above.  The comments about which he complains were not derogatory or discriminatory to Plaintiff as a Caucasian man and were made in an indiscriminate fashion to all employees.  *See Littlejohn*, 795 F.3d at 312 (citing *Leibowitz*, 584 F.3d at 502).  He does not allege that Pourkhomami treated Plaintiff "less favorably than a similarly situated employee outside his protected group."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  Similarly, Plaintiff has not demonstrated that he was harassed or discriminated against because of his sex.  "As pleaded, none of Defendants' actions directly indicate[] . . . bias" against Plaintiff as a man.  *Littlejohn*, 795 F.3d at 312.

## D.    Retaliation

Plaintiff brings retaliation claims under Title VII against Fivesky and a retaliation claim for only his complaints about the race-based comments under 42 U.S.C. § 1981 against Fivesky and Pourkhomami.[9]

Plaintiff has plausibly alleged that he participated in a protected activity and that both Pourkhomami and Fivesky knew of his protected activity.  Plaintiff complained to Pourkhomami

---

[9] Unlike Title VII, only Section 1981 may attach to individual liability.  *See Whidbee*, 223 F.3d at 75 ("[S]ome affirmative link to causally connect the actor with the discriminatory action" is needed to make out a claim for individual liability under Section 1981).

about his use of racial epithets on several occasions, AC ¶¶ 34, 39, 94, to Pourkhomami about his

religious comments, *id.* ¶ 143, to a manager at Fivesky about Pourkhomami's sexual and racist

statements, *id.* ¶¶ 61-63, and to Pourkhomami directly about his overall "discriminatory

conduct," *id.* ¶¶ 112-15.  *See Sumner*, 899 F.2d at 209 (protected activity includes "making

complaints to management, writing critical letters to customers, protecting against discriminatory

by industry or by society in general, and expressing support of co-workers who have filed formal

charges").

      While some of the complaints about racial slurs were less specific about the opposed

conduct than others, they still gave notice to Pourkhomami that Plaintiff opposed these

comments because they were made directly in response to and after Pourkhomami's use of the

racial slur and expressed that Pourkhomami should not use such language.  *See id.* ¶ 34 ("[Y]ou

can't do that."); *id.* ¶ 39 ("[S]top doing this. This is not cool."); *id.* ¶ 94 (after Pourkhomami

called a client "Nigger," Plaintiff stated that Pourkhomami "was out of control" and "need[ed] to

calm down").  The Court rejects Defendants' argument that because Plaintiff was not a member

of the protected class that was the victim of some of the hostile and discriminatory behavior by

Defendants, his complaint about such conduct cannot constitute protected activity.  "Title VII

depends for its enforcement upon the cooperation of employees who are willing to file

complaints and act as witnesses."  *Burlington N.*, 548 U.S. at 67.  If it turns out that Plaintiff

made complaints about conduct that was discriminatory against women or African Americans in

an attempt to stop such conduct and if it turns out that an adverse employment action was taken

against him because of such complaints, he will prevail.  And while it is uncertain and will

require discovery whether Plaintiff's complaints to a manager about Pourkhomami's "conduct,"

AC ¶ 62, or to Pourkhomami directly, *id.* ¶ 115, meant that he complained about the

discriminatory conduct in particular, Plaintiff alleges that he complained to Pourkhomami about the "above referenced discriminatory conduct," including race, sex, and religious discrimination, *id.* ¶ 115, and let him know that his "actions and the hostile work environment were offensive, discriminatory, and made Plaintiff feel uncomfortable," *id.* ¶ 112.  Such conversations were sufficient to put Pourkhomami and Fivesky "on notice" that discrimination was occurring.  *Int'l Healthcare Exch.*, 470 F. Supp. 2d at 357; *see also Zann Kwan*, 737 F.3d at 844 (complaints to company officer imputed general corporate knowledge of protected activity).  As a result, Plaintiff's complaints about Pourkhomami's behavior towards others, including about derogatory racial commentary, satisfies this element of a retaliation claim.

Plaintiff has further pleaded an adverse employment action that was causally connected to his protected activity, thus nudging his claims "across the line from conceivable to plausible," albeit barely.  *Iqbal*, 556 U.S. at 680.  Plaintiff alleges that two events together constitute the adverse employment action.  In late January 2019, Pourkhomami spiked his coffee with hot sauce, which burned his throat, AC ¶ 122, and that action is plausibly alleged to have been taken in retaliation for Plaintiff having made complaints to Pourkhomami one month prior about Pourkhomami's unlawful conduct, *id.* ¶ 123.  Plaintiff further alleges that "Pourkhomami's conduct . . . became more hostile after Plaintiff's numerous complaints."  *Id.* ¶ 158.

At the pleading stage, these allegations are sufficient to raise an inference of an adverse employment action taken because of Plaintiff's complaints.  *See Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018) ("[T]he burden for establishing a prima facie case of retaliation is 'de minimis.'") (citing *Hicks v. Baines*, 593 F.3d 169, 164 (2d Cir. 2010)).  As Plaintiff argued at oral argument, Pourkhomami's conduct could be analogized to a poisoning.  That will depend on facts developed in discovery.  Thus although it is true that "[a]ctions that are 'trivial harms' –

i.e., those petty slights or minor annoyances that often take place at work and that all employees experience – are not materially adverse," the Second Circuit and Supreme Court have emphasized that "context matters" and "some actions may take on more or less significance depending on the context." *Rivera v. Rochester Genesee Regional Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014); *see Burlington N.*, 548 U.S. at 69 (change in employee's work schedule "may make little difference to many workers, but may matter enormously to a young mother with school-age children"). On its face, the conduct—which could be read to be similar to an assault—is not akin to those the courts have found to be "minor annoyances" as a matter of law. *See, e.g.*, *Rasko v. N.Y.C. Admin. for Children's Servs.*, 734 F. App'x 52, 55-56 (2d Cir. 2018) (supervisor's holiday email, rudeness and "odd" way of speaking were not materially adverse actions); *Tepperwein v. Entergy Nuclear Ops., Inc.*, 663 F.3d 556, 571-72 (2d Cir. 2011) (supervisor's stare at plaintiff in a meeting while commenting "there are people here I don't like" was not a materially adverse action). Likewise, "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action" for the purpose of retaliation. *Richardson*, 180 F.3d at 446; *see Rivera*, 743 F.3d at 26-67 (supervisor's response that plaintiff should "suck it up and get over it, nigger!" concerning his complaints about co-worker racial slurs may alone constitute adverse employment action); *Caban v. Richline Grp., Inc.*, 2012 WL 2861377, at *13-14 (S.D.N.Y. July 10, 2012) (denying motion to dismiss where plaintiff alleged that defendant "retaliated against [Plaintiff] prior to his [resignation] by further subjecting [him] to a hostile work environment"); *see also Tepperwien*, 663 F.3d at 572 (actions can be considered in the aggregate).

Finally, Plaintiff has plausibly alleged causation through the close relationship between the timing of the December 2018 meeting and the coffee incident in January 2019 and

aggravated harassment shortly thereafter.  *See Gilford v. N.Y.S. Office of Health*, 2020 WL

1529359, at *4 (S.D.N.Y. Mar. 31, 2020) ("Courts in this Circuit have held that the passage of

two months between protected activity and adverse action [for retaliation] can be too long,

without more, to support an inference of causation."); *see also Gorzynski v. JetBlue Airways

Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (one month between plaintiff's complaints about racial

discrimination directed at other employees and her termination was sufficient).

### E.      New York State and City Human Rights Laws

Plaintiff brings the same discrimination, hostile work environment, and retaliation claims

against Fivesky under the NYSHRL and NYCHRL.  In addition, Plaintiff brings these claims

against Pourkhomami in his individual capacity and as an aider and abettor.

#### 1.   Company Liability

For the reasons set forth above, Plaintiff's discrimination and hostile work environment

claims based on religion and his retaliation claims under the NYSHRL against Fivesky may

proceed, while his discrimination and hostile work environment claims based on race and sex

under the NYSHRL are dismissed.[10]

Plaintiff's discrimination and hostile work environment claims based on religion and

retaliation claims are also actionable under the broader NYCHRL standard because they are

actionable under federal law.  *See Colbert v. FSA Store, Inc.*, 2020 WL 1989404, at *3 (S.D.NY.

Apr. 27, 2020).

However, Plaintiff's discrimination and hostile work environment claims based on race

and sex still fail.  Although Plaintiff need only allege "the existence of differential treatment,"

---

[10] There is no dispute that Pourkhomami's liability can be imputed to Fivesky, given his role as
principal, owner, and/or CEO of Fivesky, and Plaintiff's supervisor. *See, e.g.*, *Duch v. Jakubek*,
588 F.3d 757, 762 (2d Cir. 2009); *Swiderski v. Urban Outfitters, Inc.*, 2017 WL 6502221, at *7
(S.D.N.Y. Dec. 18, 2017) (discussing NYSHRL and NYCHRL standards).

that differential treatment still must be "because of" his race or sex. *Mihalik*, 715 F.3d at 110

(quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.YS.S.2d at 39 (1st Dep't 2009)).  Plaintiff has

not plausibly alleged that the treatment he faced was because of his race or sex.

### 2.    Individual Liability

Plaintiff also brings these claims against Pourkhomami in his individual capacity under

the NYSHRL and NYCHRL.  As a threshold matter, both the NYSHRL and NYCHRL require

the individual at issue to have "actually participate[d] in the conduct giving rise to plaintiff's

claim."  *Schaper*, 408 F. Supp. 3d at 395; *see also Malena v. Victoria's Secret Direct, LLC*, 886

F. Supp. 2d 349, 366 (S.D.N.Y. 2012).  There is no doubt that Plaintiff sufficiently alleges that

Pourkhomami "actually participated" in the conduct at issue.

The NYSHRL permits individual liability if that individual qualifies as an employer such

that the individual has "an ownership interest in the relevant organization or the power to do

more than carry out personnel decisions made by others."  *Schaper*, 408 F. Supp. 3d at 395

(quoting *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 57 (2d Cir. 2012)).  In addition to

alleging that Pourkhomami was Plaintiff's immediate supervisor, Plaintiff also alleges that

Pourkhomami was the principal, owner, and/or CEO of Fivesky and "has the authority to make

personnel decisions."  AC ¶ 20.  Plaintiff has properly pleaded that Pourkhomami is an employer

under the NYSHRL, and therefore, Plaintiff's discrimination and hostile work environment

claims based on religion and retaliation claims against Pourkhomami individually may proceed

under the NYSHRL.

Because the NYCHR allows for a "broader basis" for individual liability "regardless of

ownership or decisionmaking power," the same claims against Pourkhomami under the

NYCHRL may proceed as well.  *Schaper*, 408 F. Supp. 3d at 395.

35

### 3.    Aider and Abettor Liability

Plaintiff brings aider and abettor claims against Pourkhomami on the discrimination, hostile work environment, and retaliation claims, alleging that Pourkhomami aided and abetted the conduct of his principal, Fivesky.  The Court can find both individual liability and aiding and abetting liability against the same individual, and the standards for the NYSHRL and NYCHRL are identical.  *See Schaper*, 407 F. Supp. 3d at 396; *Colbert*, 2020 WL 1989404, at \*5-6.

Because the Court has found that Plaintiff plausibly alleged the discrimination and hostile work environment claims based on religion and retaliation claims under NYSHRL against Fivesky, and that Pourkhomami aided—and was in fact was responsible for—the conduct giving rise to those claims, it also holds that Plaintiff has plausibly alleged aiding and abetting liability against Pourkhomami on those claims.  For the same reason, Pourkhomami may be liable as an aider and abettor under the NYCHRL for discrimination and hostile work environment claims based on religion.[11]

### CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. Nos. 9 and 14.

SO ORDERED.

Dated: May 5, 2020
      New York, New York                                 LEWIS J. LIMAN
                                        United States District Judge

---

[11] Plaintiff alleges Pourkhomami aided and abetted the retaliation claim under only the NYSHRL, and not the NYCHRL.